### UNITED STATES v. DI CARLO.
Cr. 20299.

United States District Court
N. D. Ohio, E. D.
Feb. 7, 1952.

swer pertinent questions put to him as a witness before a sub-committee of a special committee of the United States Senate at Cleveland, Ohio on January 19, 1951.

Waiving his right to a trial by jury, defendant submitted the case on its merits to the court. Preceding the submission of the case, defendant moved to dismiss the indictment on the ground that because of the absence of a quorum there was no meeting of a duly authorized sub-committee of the special committee of the Senate. This contention is based upon the fact that Senator Estes Kefauver, Chairman of the Special Committee, was acting as a sub-committee of one in taking testimony of witnesses at the hearing in question.

Section 2 of Senate Resolution No. 202 specifies that a majority of the committee or a sub-committee shall constitute a quorum and authorizes the special committee to designate one or more of its members to act as the sub-committee for the purpose of taking testimony.

Pursuant to the authority thus conferred, the special committee on January 3, 1951 adopted a resolution authorizing the Chairman at his discretion "to appoint one or more sub-committees of one or more Senators, of whom one member shall be a quorum for the purpose of taking testimony and all other Committee acts, to hold hearings at such time and places as the Chairman might designate, in furtherance of the Committee's investigations of organized crime, in the vicinities of the cities of Cleveland, Ohio, and Detroit, Michigan."

In the foregoing resolutions of the Senate and of the Special Committee there is ample authority for the action of the Chairman in designating himself to act and in acting as a sub-committee of one to take testimony at the hearing in Cleveland, Ohio on January 19, 1951.

Upon the trial defendant urged that the questions he refused to answer were not pertinent to the inquiry, and in justification of such refusals he relied upon his constitutional immunity from self-incrimination.

Section 192 of Title 2 U.S.C.A. provides: "Every person who having been summoned

Don C. Miller, U. S. Atty., John J. Kane, Jr., First Asst. U. S. Atty., Cleveland, Ohio, for the United States.

Russell Mock, Youngstown, Ohio, for defendant DiCarlo.

McNAMEE, District Judge.

Defendant was charged in an indictment containing eight counts with violating Title 2, Section 192 U.S.C.A., in refusing to an-

as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

The hearing on January 19, 1951 was conducted openly in one of the court rooms in the Federal Building in Cleveland, Ohio. The court room was taxed to capacity by the presence of spectators, law-enforcement officials of various branches of the federal, state and local governments, newspaper reporters, photographers, radio broadcasters and television cameramen. The Chairman of the Committee was assisted by a staff of attorneys and investigators. Wide publicity was given to the proceedings and to the preliminary investigations made immediately prior thereto. As a result of these preliminary investigations there was a vast amount of information relative to the operations and identity of reputed violators of federal and state laws in the possession of the Committee at the time the hearing commenced. •

Several law-enforcement officials preceded the defendant as a witness. One of these was Edward J. Allen, Chief of Police of Youngstown, Ohio, where the defendant resides. The testimony of Chief Allen was taken on January 18, 1951, the first day of the hearing. Allen testified that before his arrival in Youngstown in 1946 the defendant had a "long time criminal record in Buffalo, New York," and that since defendant came to Youngstown he was a member of a triumvirate consisting of one Aiello, Caputo, and himself, which "demanded and received fifty per cent of the local take from the various 'bookies' that operated in Youngstown, Ohio." The witness also

stated that the defendant was engaged in the operation of slot machines in Mahoning County "which surrounds the city of Youngstown." In his testimony Allen linked defendant with the so-called "Licavoli gang," which he asserted had connections in various parts of the country, including Cleveland, Youngstown and vicinity, Warren, Ohio, and Buffalo, New York. The witness submitted to the Committee a chart which he had prepared at the suggestion of one of counsel for the Committee, which depicted these connections in graphic form and which listed the defendant as a member of the gangs that operated in and around Youngstown, Ohio and Buffalo, New York. Chief Allen expressed the opinion that the members of the gang operated "a government within a government," and obtained control of "legal and illegal enterprises" by "forcibly excluding others." The witness indicated his belief that district leadership of the gang was attained through "force" and "ruthlessness",—"the whole fabric of which is based on murder." It was apparent that since his induction as Chief of Police of Youngstown in 1948 the witness had made and was making a determined effort to stamp out racketeering in the area within his jurisdiction.

The defendant appeared as a witness on the following day, January 19, 1951. Many questions were put to him. He was examined about his criminal record and his present and past activities and associates. He answered all but a few of the questions. His refusal to answer the questions contained in the indictment was upon the stated ground that the answers thereto would tend to incriminate him. The first five questions relate to defendant's business in Youngstown, Ohio in 1945 or 1946—his business in 1947—whether he was in the slot machine business in 1947 "or thereabouts"—whether he was associated with others in the "bookie" business "in the last seven years," —and whether he was "ever in the gambling business in Buffalo," New York. The last three inquiries sought to learn the identity of persons in Youngstown with whom the defendant was acquainted when he went to that city,—and the nature of his business dealings with Aiello and Caputo.

The first issue to be determined is whether these questions were pertinent to the inquiry.

■ It is not open to question that the Congress or either House thereof, acting through committees, has the power to conduct investigations in aid of its legislative function and that a legislative inquiry may be as broad as the legislative purpose requires. Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352; United States v. Emspak, D.C. 95 F.Supp. 1012. Nor is there any doubt that Congress may compel disclosure of facts pertinent to the inquiry. McGrain v. Daugherty, 273 U.S. 135, 47 S.Ct. 319, 71 L.Ed. 580. Pertinency is an element of the offense defined by Section 192 of Title 2 U.S.C.A. And the burden rests upon the government to establish the pertinency of the questions propounded. The question of pertinency under Section 192 is one of law—and not dependent upon the probative value of evidence. Sinclair v. United States, 279 U.S. 263, 268, 49 S.Ct. 268, 273, 73 L.Ed. 692. The test of pertinency as applied by the Supreme Court in the Sinclair case was "whether the facts called for by the question were so related to the subjects covered by the Senate's resolutions that such facts reasonably could be said to be 'pertinent to the question under inquiry.'" Applying that test here, the pertinency of the questions put to the defendant is to be determined by reference to the terms of Senate Resolution 202.

That resolution created a Special Committee of five members of the Senate—"to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur, and, if so, the manner and extent to which,. and the identity of the persons, firms, or corporations by which such utilization is being made, what facilities are being used, and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupt-

ing influences in violation of law of the United States or of the laws of any State: *Provided, however,* That nothing contained herein shall (1) authorize the recommendation of any change in the laws of the several States relative to gambling, (2) effect any change in the laws of any State relative to gambling, or (3) effect any possible interference with the rights of the several States to prohibit, legalize, or in any way regulate gambling within their borders."

The wide scope of the inquiry is spelled out explicitly in the broad and comprehensive language of the resolution. Its clearly indicated purpose was to ascertain the facts in relation to the suspected or reputed use of the facilities of interstate commerce, either in the furtherance of violations of state and federal laws, or in aid of the development of corrupting influences in violation of such laws. The resolution specifically directed an investigation of the identity of "persons, firms, or corporations" utilizing the facilities of interstate commerce in furtherance of the described illegal purposes. Manifestly, such a determination could most effectively be made by a discovery first of the identity of the violators of State and federal laws. That Congress has the power to investigate violations of federal laws with a view to further legislation pertaining thereto, cannot be questioned. To the extent that Congress has defined offenses against the United States it has done so pursuant to the powers expressly granted by the Constitution or in the exercise of those auxiliary powers necessary to make the express powers effective.

■ But, as Congress is without power to legislate upon subjects exclusively within the reserved powers of the States, it can not investigate those subjects, except as they may affect matters within the scope of the powers granted to the federal government. Congress has the power to regulate interstate commerce. Article I, Section 8, Constitution. In the exercise of such power Congress has the undoubted right to investigate all matters affecting commerce between and among the states. Necessarily this includes the power to investigate subjects within the exclusive jur-

isdiction of the states to ascertain whether matters of local concern impinge upon or affect interstate commerce. To construe Senate Resolution 202 less broadly than as conferring power to investigate violations of state law would be to thwart its salutary purpose and constitute an unwarranted attempt to abridge Congressional powers of inquiry. But it would seem that where Congress undertakes to investigate violations of the criminal laws of the states as an incident of its power to regulate interstate commerce, such power must be exercised with due regard for the constitutions of the several states and the rights of witnesses thereunder. It is fundamental in the federal system that the independence and sovereignty of the states cannot be invaded by the federal government.

Accordingly it is held that it was within the competence of the Special Committee to investigate violations of state law as well as violations of federal law and that the questions put to the defendant were pertinent to the inquiry.

There remains for determination the question whether the Committee, in the exercise of such powers, was required to respect the immunity of witnesses against self-incrimination of violations of state laws as well as the immunity of witnesses against disclosures that might subject them to prosecution by the federal government.

The Fifth Amendment to the Constitution of the United States provides, in part, "No person * * * shall be compelled in any criminal case to be a witness against himself". As to the rights of witnesses who invoke the Fifth Amendment as a protection against prosecutions by the federal government, no serious question of law is presented. In all such cases the constitutional provision must be given a liberal construction in favor of the right it was intended to secure. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110; Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138. That the privilege of immunity extends to witnesses appearing before Congressional committees is well settled. United States v. Emspak, supra. The power of inquiry of

the respective Houses of Congress must be exercised with due regard for the rights of witnesses. Sinclair v. United States, supra.

In 1807, in the trial of Aaron Burr, United States v. Burr, (In re Willie,) 25 Fed.Cas. pp. 38, 40, No. 14,692, Chief Justice Marshall declared: "It is the province of the court to judge whether any direct answer to the question which may be proposed will furnish evidence against the witness. If such answer may disclose a fact which forms a necessary and essential link in the chain of testimony, which would be sufficient to convict him of any crime, he is not bound to answer it so as to furnish matter for that conviction. In such a case the witness must himself judge what his answer will be; and if he say on oath that he cannot answer without accusing himself, he cannot be compelled to answer."

Since its pronouncement the foregoing statement has been accepted by the courts of the United States as embodying the rule that governs in determining whether the witness's asserted right to remain silent is justified. As recently as April 25, 1951, in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 818, 95 L.Ed. 1118, the Supreme Court restated the proposition that "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." The court immediately added the qualifying declaration first announced in Mason v. United States, 244 U.S. 362, 365, 37 S.Ct. 621, 61 L.Ed. 1198, that "this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." As a final word upon the applicable principle, the Supreme Court, in the Hoffman case, said: "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could

result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'" See Taft, J., in Ex parte Irvine, C.C.S.D. Ohio 1896, 74 F. 954, 960.

Whenever a witness refuses to answer pertinent questions, the validity of his justification is to be determined by the application of the foregoing principles.

The government contends that none of the questions propounded to the defendant related to matters tending to involve him in the commission of a federal offense. This is correct. But it is clear that, considering the setting in which the questions were asked, answers thereto or explanations of refusals to answer might involve the defendant in the commission of offenses against state laws.

The government maintains that the immunity of the Fifth Amendment does not extend to exoneration from compulsory self-incrimination of state offenses. The government's position in this regard is unchallenged. It is supported by United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210, which was followed in United States v. Greenberg, 3 Cir., 187 F.2d 35; on rehearing, 3 Cir., 192 F.2d 201. As a general statement of law this is correct. But in determining the rights of a witness who is interrogated about violations of state law by a federal agency, there is presented the serious and important question whether the immunity of the Fifth Amendment ought not to be extended to afford the witness protection against disclosures that might subject him to prosecutions under state law. That question was not decided in United States v. Murdock, supra, and, as will be shown, the Supreme Court observed that the Murdock case presented no question involving matters of "state concern." If the immunity of the Fifth Amendment cannot be thus extended, then the question is—Does the federal government, investigating state crimes, possess the power to deny witnesses their rights to immunity against self-accusation under the Constitutions of the States?

In the Murdock case the defendant, in his federal income tax returns for 1927 and 1928, deducted $12,000 for each year, which he claimed he had paid to others. He was summoned to appear before an authorized revenue agent and disclose the recipients. Murdock appeared but refused to disclose the information on the ground that to do so would incriminate him of an offense against the state law. It appears from the brief of the government in that case that Murdock had been violating the gambling laws of Illinois and had been paying officials of the state. for permission to do so. It also appears that under the then applicable provision of the Revenue Act it was an offense against the United States "to willfully fail to supply information for the purposes of computation, collection or assessment of any tax imposed by the Act." Murdock was therefore required to disclose to the Revenue Agent the information requested. The inquiry there was in relation to a matter within the sole jurisdiction of the federal government. The fact that a disclosure of the information might subject the witness to a prosecution under the state law was not a valid excuse. The holding of the Supreme Court in the Murdock case on the point here discussed is epitomized in the third paragraph of the syllabus of that case, which reads: "To justify under the Fifth Amendment a refusal to give information in an investigation under a federal law in respect of a federal matter, the privilege from self-incrimination must be claimed at the time when the information is sought and refused and must be invoked as a protection against federal prosecution; danger and claim that disclosure may lead to prosecution by a State is not enough."

However, Mr. Justice Butler, who wrote the opinion for a unanimous court, was careful to note that—"The plea does not rest upon any claim that the inquiries were being made to discover evidence of crime against state law. Nothing of state concern was involved. The investigation was under federal law in respect of federal matters." U. S. v. Murdock, supra, 284 U.S. at page 149, 52 S.Ct. at page 64.

It is not to be assumed that this statement was idly made. Apparently the Supreme Court deemed it important and appropriate to note that the investigation in the Murdock case was under federal law and in respect to a matter solely within the jurisdiction of the federal government.

Such is not the fact here. Matters of "state concern" were embraced within the broad compass of Senate Resolution 202 and "inquiries to discover evidence of crime against state law" were put to the defendant DiCarlo.

Thus the factors which the Supreme Court observed were absent in the Murdock case are present here. Involving as they do, subjects within the exclusive jurisdiction of the states, these factors raise an issue that was not in the Murdock case and as to which the rule therein announced does not apply.

In United States v. Greenberg, supra, the Court of Appeals for the Third Circuit, relying on United States v. Murdock, supra, held that a witness before a federal grand jury was not privileged under the Fifth Amendment to decline to answer questions involving violations of state law. The Greenberg case is distinguishable from the instant case in that there, the inquiries were propounded in the secrecy of a federal grand jury investigation where the danger from disclosure was slight. The situation was quite the contrary in the instant case where the witness was called upon in the presence of state law-enforcement officials to make disclosures involving violations of state law. And it may be assumed that in the charged atmosphere of an open and widely publicized investigation, state officials would not have failed to act upon incriminating disclosures pointing to violations of state law.

United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69, illustrates the principle that governs in cases where it is sought through civil proceedings in a federal court to compel disclosures that would subject parties to the action to prosecutions under state law. In that case an action was commenced in the United States District Court for Virginia for discovery and relief. The very brief opinion of Chief Justice Marshall summarizes the facts and states the reasons for the decision. It reads: "This is a bill in equity for a discovery and relief. The defendants set up a plea in bar, alleging that the discovery would subject them to penalties under the statute of Virginia. The court below decided in favor of the validity of the plea and dismissed the bill. It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. The rule clearly is that a party is not bound to make any discovery which would expose him to penalties, and this case falls within it. The decree of the court below is, therefore, affirmed."

Apparently Chief Justice Marshall had no difficulty in concluding that in an action in a federal court involving a state statute, the defendants were protected against disclosures subjecting them to penalties under the state law.

To the same effect, although apparently not necessary to a decision in the case, is the statement of Mr. Justice Holmes in Ballmann v. Fagin, 200 U.S. 186, 195, 26 S.Ct. 212, 213, 50 L.Ed. 433: "As we have said, he set forth that there were many proceedings on foot against him as party to a 'bucket shop,' and so subject to the criminal law of the state in which the grand jury was sitting. According to United States v. Saline Bank, 1 Pet. 100, 7 L.Ed. 69, he was exonerated from disclosures which would have exposed him to the penalties of the state law."

Thus, in cases decided before United States v. Murdock, supra, two of the most illustrious jurists ever to sit upon the Supreme Court, speaking for the court, recognized the privilege of the witness and of parties in a federal proceeding, to immunity against disclosures that would expose them to the danger of state prosecutions; and in the only Supreme Court decision relied upon by the government the court made special note of the absence of any matter of "state concern".

In the Murdock case the court made no reference to United States v. Saline Bank, supra, or to Ballmann v. Fagin, supra. Nor

did the court repudiate the rule laid down by Chief Justice Marshall in the former or disapprove the dictum of Mr. Justice Holmes in the latter case.

In the light of its facts and the reasoning of the court, the binding effect of the Murdock case cannot be extended to cases where, in the exercise of the overlapping jurisdiction of the federal government, a Congressional committee enters upon investigations of state crimes. But in the search for the principle that ought to govern in such cases, United States v. Saline Bank, supra, may be accepted as a reliable guide.

It is fundamental that all branches of the federal government are by constitutional mandate required to respect the sovereignty and independence of the states. Decisions of the courts demonstrating undeviating adherence to this basic requirement are too numerous and well known to warrant citation. Reference need only be made to the policy of the federal courts in refusing to interfere with the prosecution of crime in the state courts; and of the repeated refusals of the Supreme Court of the United States to disturb convictions under the criminal laws of a state, except where there has been a denial of due process under the Fourteenth Amendment. In applications for writs of habeas corpus involving an interpretation of state statutes it is the policy of the federal courts to accept and apply the construction of those statutes as determined by state courts. Since Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 823, 82 L.Ed. 1188, it has been the law in civil cases where the United States assumes jurisdiction on the ground of diversity of citizenship that the federal courts are required to apply the state law as interpreted by the highest state court. In that celebrated case, Mr. Justice Brandeis declared that in following a contrary policy for many years under the doctrine of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, the courts of the United States had invaded rights "which in our opinion are reserved by the Constitution to the several states."

In all such cases within the above and similar categories the judicial branch of the federal government had full jurisdiction to adjudicate the matters in controversy, but was required to and did recognize the controlling effect of state law.

For reasons equally compelling, it would seem that the legislative branch of the federal government, exercising limited jurisdiction merely to investigate violations of state laws, ought to be required to respect and give effect to the constitutions of the several states.

It is true that the first ten Amendments to the United States Constitution operate solely as restraints upon federal powers. But there is a further restraint upon the power of the federal government. It is inherent in the delegation of limited powers under the federal Constitution and the reservation therein of all other powers to the States and to the people. Although Congress may be conceded the power to investigate state crimes in aid of its authority to determine the need of federal legislation under the Commerce clause, it cannot be deemed to possess the power to suspend constitutional rights granted by the states to persons amenable to state laws. Or, as otherwise stated, Congressional power to investigate violations of state laws does not include the power to nullify the state constitutional rights of a witness.

The Constitutions of the States of Ohio and New York, in common with those of other States of the Union, contain provisions similar to the Fifth Amendment securing immunity to witnesses against self-incrimination. These constitutional provisions, together with the Fifth Amendment, represent the purpose of the people of the United States to protect witnesses in criminal cases, in both federal and state jurisdictions, against compulsory self-accusation. The Constitution of each sovereignty operates only within its separate jurisdiction. But this principle does not exempt the federal government, when it assumes limited jurisdiction to investigate matters within the domain of the states, from respecting the state-granted constitutional rights of persons subject to state law. That the United States Senate recognized the absence of federal power to

legislate on matters of purely local concern is implicit in the proviso in Senate Resolution 202 against recommendations affecting the gambling laws of the states.

That the Congress, in the exercise of its investigative powers in such matters, is also without authority to override state constitutional provisions, seems indisputable.

The investigation of organized crime by the Special Committee was unprecedented in its scope. Its objectives were to ascertain wherein, in what manner, and by whom, violations of federal and state laws were being aided in their accomplishment by operations in, or the use of, the facilities of interstate commerce. In its efforts to accomplish these purposes the Special Committee made many inquiries relating only to violations of state and federal laws and the identity of the offenders. Such questions included no reference to the use of interstate facilities or operations in interstate commerce. In so far as these questions related to violations of state laws, they involved matters exclusively within the jurisdiction of the states. The questions set forth in the indictment are in this category. No branch of the government of the State of Ohio could compel the defendant as a witness to incriminate himself of violations of state laws. Hebebrand v. State, 129 Ohio St. 574, 196 N.E. 412. To hold that a Congressional committee may do so would be to invest the committee with plenary powers of inquisition in matters of state concern, unfettered by the constitutional provisions that restrain the power of the state itself. Due respect for the sovereignty and independence of a state in all matters within its reserved powers forbids such a determination.

 The foregoing considerations lead inescapably to the conclusion that the defendant is entitled to immunity against disclosures that might incriminate him of violations of state law as well as immunity against self-incrimination of a federal crime. If this conclusion cannot be said to rest upon the principle of state supremacy in the domain of reserved powers, as hereinabove discussed, it finds ample support in the principle that the Fifth Amendment operates as a restraint upon federal officers investigating state crimes.

It does violence to the American concept of constitutional governments in a system of dual sovereignties to suppose that there is an area of overlapping federal jurisdiction in which the federal government is released from constitutional restraints upon governmental power.

The rule that the Fifth Amendment affords protection only against prosecutions of federal offenses was declared in the Murdock case. The language of the opinion in that case impliedly negatives the suggestion that the rule should be thus limited in its application in cases where a federal investigation involves "inquiries to discover evidence of a state crime." The Murdock case therefore presents no barrier to the extension of the immunity of the Fifth Amendment to witnesses in a Congressional investigation of state crime. United States v. Saline Bank, supra, supports the view that the immunity of the Fifth Amendment may be so extended. While no express reference is made to the Fifth Amendment in that case, the implication is unmistakable that the decision rests upon the authority of the immunity clause of that Amendment. The same is true of the statements of Mr. Justice Holmes in Ballmann v. Fagin, supra. The Fifth Amendment operates as a restraint upon federal officers and federal agencies investigating federal matters. No good reason appears why this restraint should be removed in a federally-conducted investigation of state crime.

For the reasons assigned, I am of the opinion that the defendant as a witness was entitled to claim immunity against disclosures that might subject him to prosecution under either federal or state laws.

Affirmative answers by the defendant to the first three questions disclosing—that he was in the gambling business in 1946 and 1947—would not have exposed him to the danger of prosecution under the gambling laws of Ohio. Section 12381, G.C. of Ohio provides that prosecutions for misdemeanors must be commenced within three years after the offense was committed.

An affirmative answer to the question in count No. 4, however, might well have a different effect. "The last seven years" includes, of course, a period of time less than three years prior to the investigation.

■ The question in count No. 5—"Was he *ever* in any gambling business in Buffalo?" (emph. sup.)—is indefinite as to time. Whether an affirmative answer thereto would have disclosed that the defendant was in the gambling business in New York within the two years covered by the New York statute of limitations is not clear. Section 142—New York Criminal Code. It might be assumed that this question was related in time to a period prior to 1946. But it was not in terms so limited, and any doubt must be resolved in favor of the defendant. However, it is quite clear that defendant was no ordinary gambler. His record and reputation were such as to make him suspect of more serious violations of state law committed in connection with gambling. Together with others he was suspected of "muscling in" on gamblers and being a member of a ruthless gang of organized criminals reputedly engaged in acts of intimidation, violence, and even murder. In the Third Interim Report of the Special Committee, issued under date of May 1, 1951, the defendant and others were described as "muscle men" for a gambling syndicate.

■ The implications of these questions extend beyond possible violations of the gambling laws. In these circumstances it cannot be said that the defendant was not justified in refusing to answer the foregoing questions.

The question in count No. 6, in which the defendant was asked whom he knew in Youngstown when he went to that city in 1946, was answered in large part by his responses to a long series of questions put to him in relation to the same subject-matter.

■ The questions in counts 7 and 8 relate to his alleged business dealings with Aiello and Caputo, who were also considered to be "muscle men." Answers to those questions could well furnish links in the chain of evidence involving the defendant in serious violations of state laws. He was not contumacious in refusing to answer them.

It may be a matter of regret that constitutional rights are most frequently upheld for the benefit of those least deserving of their protection. But constitutional rights are not dispensations granted only to the virtuous and the good. They are fundamental rights possessed by all. They afford protection to the law violator as well as to the law-abiding citizen. If at times the premium paid to preserve constitutional guaranties seems high, it is to be remembered that the Bill of Rights is the individual's insurance against arbitrary encroachments of government.

The defendant is adjudged not guilty on all counts of the indictment.