**UNITED STATES v. ORMAN.**
No. 10837.

United States Court of Appeals
Third Circuit.

Argued Feb. 2, 1953.

Decided Sept. 18, 1953.

**150**

William E. Leahy, Washington, D. C. (Edward I. Feinberg, Atlantic City, N. J., William J. Hughes, Jr., Washington, D. C., on the brief), for appellant.

Grover C. Richman, Jr., U. S. Atty., Newark, N. J. (Alexander Feinberg, Asst. U. S. Atty., Camden, N. J., on the brief), for appellee.

Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.

BIGGS, Chief Judge.

This is an appeal from a conviction for contempt of a Subcommittee of the United States Senate's Special Committee to Investigate Organized Crime in Interstate Commerce.[1]

It is desirable in this case to make a detailed statement of the circumstances so that the reader may not only perceive the operative facts but also may be aware of the background of the case. On July 3, 1951, the Subcommittee caused a subpoena to be issued commanding the defendant Orman to "produce all your records, papers, statements and documents concerning business, employment and financial transactions and a copy of your income tax returns for the years 1947, 1948, 1949 and 1950." Orman appeared before the Subcommittee on July 6, 1951, with the required copies of the tax returns; he produced no other records prior to 1951 for he had destroyed them after making his tax returns. At the hearing on July 6 it developed that Orman was keeping a book containing notes of his business transactions for 1951. Mr. Lane, of counsel for the Subcommittee, expressed his desire to see this book, and Senator Hunt formally stated: "The acting chairman of the subcommittee directs the witness, Mr. Orman, to produce his book containing the records of his business transactions for the year 1951."

On the following day, July 7, 1951, Orman brought the book before the Sub-

1. The contents of the Senate Resolutions constituting the Committee and containing its powers are quoted in pertinent part at later points in this opinion. See "Part I". The Committee's powers were extended to September 1, 1951, by Senate Resolution 129, 82nd Cong., 1st Sess. (April 24, 1951).

committee. He apparently handed the book to Mr. Lane, but retrieved it almost immediately to assist in explaining the entries. Orman then refused to read from the book anything except the gross amounts of his 1951 income. He said: "I do not want this to be made public. I think this is my own personal business. This record is going to be made public and a lot of statements will be made like in yesterday's paper. Some of them do not mean anything."

Counsel asked: "Will you let me have the book?"

Orman replied: "No. I do not think I will let you have the book unless I know my business is not going to be made public. I think I am entitled to that courtesy."

Senator Hunt then directed Orman to read the entries, warning him that he might be in contempt of the Subcommittee if he refused. Orman said that the entries did not "mean a thing" and he declined to read the entries or to deliver the book to the Subcommittee.

On July 10, 1951, a second subpoena was issued commanding Orman to appear before the Subcommittee on July 17, 1951, and specifically directing him to produce his 1951 book of financial transactions. Orman again brought the book to the hearing, but when Mr. Moser, Chief Counsel to the Committee, asked him "Will you please produce that book?", he replied "No; I will not." Mr. Moser asked: "And why do you refuse to show it to the committee?" Orman replied: "Because I do not want it to become public property, to be given to the newspapers. That is my personal business." Counsel then inquired: "Is it giving it to the newspapers to give it to us?" and Orman replied: "I think so." Counsel for the Subcommittee then asked: "You do?" Orman replied: "Yes." The Committee's counsel then inquired: "You refuse to produce it before this closed session of the committee on that ground?" Orman stated: "Unless I have an assurance that it will not be given to the newspapers. I must be assured of that first. First of all, this is not pertinent to this investigation, as far as I could determine, but I was very nice and gracious enough to sit through two and a half hours of my income taxes, which I think have nothing to do with this investigation, as far as crime and what this investigation is headed under. I had nothing to do with that. I sat here and tried to be very helpful. * * * "

The colloquy went on. Counsel asked: "Will you please let me see the book?" Orman replied: "I will let you see the book." Counsel said: "Then please do so." Orman asked: "Is it not going to be read into the record?" Counsel said: "I am not going to decide now whether it will go into the record. If it is material, it will certainly go into the record." Orman then said: "I refuse to give you the book." Counsel asked: "You refuse to give me the book on the sole ground of your not wanting to go into the record?", and Orman replied: "I don't care about it going into the record." Counsel then said: "I want an exact statement of the ground for refusing to show us the book." Orman replied: "I don't want the contents of this book to be published in the newspapers and made public property as there have been some other statements made before about myself. I do not know by whom. I am in business in this town."

On the same day, July 17, 1951, the following colloquy also took place:

Counsel for the Subcommittee asked: "You borrowed $25,000 [in December, 1950]?" Orman said: "That is right." Counsel asked: "From whom did you borrow that?", and Orman replied: "From a friend of mine." Mr. Moser inquired: "What is his name?" Orman said: "I cannot tell you." Counsel asked: "You do not know?" Orman said: "I won't tell you; no." The inquiry was then made: "Why?" Orman simply stated: "I don't want to tell you." Counsel said: "You refuse to answer? On what ground?", and Orman replied: "It is my personal affairs." Counsel then said: "You just refuse to answer?"

Orman replied: "That is right. It is my personal affairs." Counsel then asked: "Under that you are running the risk of a charge of contempt if you refuse to answer that, do you know?" Orman said: "I do, sir." Counsel finally asked: "You still refuse to answer?" Orman replied: "I do, sir."

On September 18, 1951, the Special Committee to Investigate Organized Crime in Interstate Commerce submitted a report to the Senate describing the above proceedings and included a resolution that the United States Attorney for the District of New Jersey should be required to proceed against Orman in the manner prescribed by law. This resolution was adopted and became Senate Resolution 211, dated October 1, 1951.[2]

Orman was then indicted on four counts for violation of Section 192, Title 2, U.S.C.A.[3] Count 1 charged that Orman on July 7, 1951, " * * * wilfully made default in that he refused to turn over his 1951 book of accounts pertaining to his income, which records were pertinent to the matter under inquiry by the * * * Committee." Count 2 made an identical charge relating to Orman's refusal to let the Subcommittee have the book on July 17, 1951. Count 3 further charged that Orman on July 17, 1951, " * * * refused to answer the following question pursuant to the Committee seeking to ascertain from whom the defendant Herman Orman had borrowed certain sums of money, which question was pertinent to the question under inquiry by the * * * Committee: 'What is his name?' " Count 4 made an identical charge relating to the Subcommittee's similar directive on the same date: "Mr. Orman, the acting chairman directs you to answer the question asked you by the counsel."

At the trial the jury returned a verdict of guilty on each count of the indictment. The court below sentenced Orman to twelve months imprisonment on Counts 1 and 3, the terms to run concurrently, and to a suspended sentence and one year's probation on Counts 2 and 4, the probationary periods to run concurrently but commencing at the expiration of the sentences imposed on Counts 1 and 3.

On this appeal Orman contends broadly that under all the circumstances his refusal to disclose the items in his 1951 book of accounts did not constitute a willful default within the indictment and the statute. He also argues that it was not pertinent to the investigation undertaken by the Senate Crime Committee either to demand his 1951 book of accounts or to ask the name of the person from whom he had borrowed the $25,000. We will discuss these contentions.

I.

Orman challenges the pertinency of the book and of the name of the person who loaned him $25,000. Specifically, Orman

2. The Resolution was as follows:
"S.Res. 211
    "In the Senate of the United States,
            "October 1, 1951.
    "Resolved, That the President of the Senate certify the report of the Special Committee To Investigate Organized Crime in Interstate Commerce of the United States Senate as to the refusal of Herman Orman to disclose to the said special committee the contents of those records and documents which he had been directed by subpoena to produce and to answer a series of questions before the said special committee, together with all the facts in connection therewith, under the seal of the United States Senate to the United States attorney for the District of New Jersey, to the end that the said Herman Orman may be proceeded against in the manner and form provided by law.
    "Attest:
                "Leslie L. Biffle,
                    Secretary."

3. "Every person who having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers upon any matter under inquiry before either House, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100, and imprisonment in a common jail for not less than one month nor more than twelve months."

claims error in the trial court's view of the law set out in the following portion of the charge to the jury:

"In that particular respect, ladies and gentlemen, there has been argument here as to whether or not it was pertinent to the committee where the defendant actually got the $25,000. And there has likewise been argument here as to whether or not it was pertinent to the committee what was in the book. That is not the question, in my estimation. The question is, could it have been pertinent to this Senate inquiring committee in July of 1951; could it have been pertinent to such inquiry where Mr. Orman got the $25,000. If it could have been pertinent, they were entitled to an answer. If it could have been pertinent to such inquiry at that time what information would be disclosed in the book, then they were entitled to have the book at that time. And you and I are not to pass now upon the information disclosed in either the book or the information disclosed in the court room of where he got the money. It's a question could it have been pertinent at the time the question was propounded by the Senate in their inquiry."

Acting consistently with this view, the trial court had excluded all evidence of the actual contents of the book and of the name of the man who loaned Orman $25,000. Orman contends that this exclusion was erroneous. Orman also argues that since the question of pertinency was one of law, it was error for the trial court to submit this question to the jury. His view is that as a matter of law, taking into consideration the contents of the book and the name of the lender, the requirement of pertinency was not met.

▮ Pertinency under Section 192 has been much discussed in the cases. "Pertinent," as used to describe a requisite for valid congressional inquiry, means "pertinent to a subject matter properly under inquiry, not generally pertinent to the person under interrogation." Rumely v. United States, 1952, 90 U.S.App.D.C. 382, 197 F.2d 166, 177, affirmed, 1953, 345 U.S. 41, 73 S.Ct. 543. Because of the scope and purpose of congressional investigations, pertinency in this context is necessarily broader than relevancy in the law of evidence. "A legislative inquiry may be as broad, as searching, and as exhaustive as is necessary to make effective the constitutional powers of Congress. * * * A judicial inquiry relates to a *case*, and the evidence to be admissible must be measured by the narrow limits of the pleadings. A legislative inquiry anticipates *all possible cases* which may arise thereunder and the evidence admissible must be responsive to the scope of the inquiry, which generally is very broad." Townsend v. United States, 68 App.D.C. 223, 95 F.2d 352, 361, certiorari denied, 1938, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121.

▮ As indicated in these definitions, two separate elements must appear before pertinency is established: (1) that the material sought or answers requested related to a legislative purpose which Congress could constitutionally entertain; Kilbourn v. Thompson, 1880, 103 U.S. 168, 26 L.Ed. 377; McGrain v. Daugherty, 1927, 273 U.S. 135, 173, 47 S.Ct. 319, 71 L.Ed. 580; Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied, 1948, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767, rehearing denied, 1950, 339 U.S. 971, 70 S.Ct. 1001, 94 L.Ed. 1379; and (2) that such material or answers fell within the grant of authority actually made by Congress to the investigating committee; Bowers v. United States, D.C.Cir., 202 F.2d 447; Rumely v. United States, supra. Although Section 192 does not use the word "pertinent" in referring to the production of papers, both of the elements referred to are required in establishing contempt for refusal to produce papers as well as for refusal to answer questions. Marshall v. United States, 1949, 85 U.S. App.D.C. 184, 176 F.2d 473, certiorari denied, 339 U.S. 933, 70 S.Ct. 663, 94 L.

Ed. 1352, rehearing denied, 1950, 339 U.S. 959, 70 S.Ct. 976, 94 L.Ed. 1369. The trial court's charge in the instant case reflects this view.

■ It has also been said by the Supreme Court that a witness before a congressional committee is bound to judge rightly as to pertinency. His honest mistake of law is no defense. Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692. But since a conviction for contempt may be had only for refusal to respond to pertinent inquiries, pertinency is an element of the offense to be proved, and the burden of proof is on the United States. Bowers v. United States, supra; see Sinclair v. United States, supra, 279 U.S. at pages 296–297, 49 S.Ct. at page 272–273. It is for this reason that a defendant cannot be held to have waived his objection to the pertinency of an investigating committee's inquiries. In the instant case it is therefore immaterial that Orman did not explicitly raise this objection at each hearing he attended.

Orman does not contend here that the Senate Special Committee to Investigate Organized Crime in Interstate Commerce was gathering material for unconstitutional legislative purposes. Such a contention could not succeed. See U.S. Const. Art. 1, § 8; United States v. Di Carol, D.C.N.D.Ohio 1952, 102 F.Supp. 597. Contrast Rumely v. United States, supra. He does challenge the pertinency of the inquiries made of him to the Committee's grant of authority. This authority is set forth in Senate Resolution 202, 81st Cong., 2nd Sess. (May 3, 1950), creating the Committee and directing it: " * * * to make a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce in furtherance of any transactions which are in violation of the law of the United States or of the State in which the transactions occur, and, if so, the manner and extent to which, and the identity of the persons, firms or corporations by which

such utilization is being made, what facilities are being used, and whether or not organized crime utilizes such interstate facilities or otherwise operates in interstate commerce for the development of corrupting influences in violation of law of the United States or the laws of any State * * *."

Orman contends that the United States has not sustained the burden of proof required of it that the contents of his 1951 book of accounts and the name of the person who loaned him $25,000 were pertinent to this investigation of interstate crime.

■■ We conclude first that the trial court's charge to the jury on the question of pertinency was a correct statement of the law. As the trial court stated during the trial, " * * * the question is: was the question and the *possible* answer pertinent at that time to the [Committee's] inquiry?" (Emphasis added.) This of course applies equally to the request to disclose the entries in the 1951 book of accounts. Orman, however, prepared his defense on the assumption that the actual contents of the book and the name of the person who loaned him $25,-000 were evidence to be considered in determining pertinency. This assumption was wrong. Under Section 192 it is the question which must be pertinent. Marshall v. United States, supra; see Sinclair v. United States, supra, 279 U.S. at pages 296–297, 49 S.Ct. at pages 272–273; United States ex rel. Cunningham v. Barry, 3 Cir., 1928, 29 F.2d 817, reversed on other grounds, 1929, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867. An innocent, true answer does not destroy the pertinency of the question. It was therefore not erroneous for the trial court to keep Orman's evidence from the jury, even assuming that this evidence disclosed no criminal conduct related to the inquiry into interstate crime.

■■ This does not mean that a congressional committee possesses the power to examine private citizens indiscriminately in the mere hope of stumbling

upon valuable information and to cite them for contempt if they refuse to answer. Where, as in the instant case, the questions asked and the documents requested, are not clearly pertinent on their faces to the committee's authorized investigation, the United States in a contempt proceeding must prove by other evidence the relation of the questions, the documents and the particular witness to the investigation. Bowers v. United States, supra. We think the United States introduced adequate evidence to enable the jury to find that the inquiries made of Orman were pertinent. The principal witness for the prosecution was Mr. Moser, who was, as we have said, Chief Counsel to the Committee at the time of Orman's interrogation. He testified that Orman was selected to appear because of information received by the Committee in the course of their investigations in Atlantic City, Orman's place of residence. This in itself was insufficient to prove pertinency but it is some evidence why it was reasonable for the Committee to summon Orman. The United States also introduced in evidence the transcript of Orman's testimony before the Committee on July 6, 7 and 17, 1951. At numerous places in that testimony Orman himself admitted that he had received substantial portions of his income for recent years from gambling.

Orman's counsel at the trial made no attempt to deny this, stating: "I don't say he is not a gambler but, I say, that is not his principal business." The Court replied: "Well, aren't we arguing about a distinction without a difference."

This, taken in conjunction with the Committee's knowledge of the methods of operation of gamblers over state lines,[4] made it pertinent for the Committee to inquire further into the items and sources of Orman's income. Orman's objection to the relevancy of this testimony was properly overruled. The trial court charged the jury that this evidence was received "so that you * * * [can] determine from all of the information

that the Committee had obtained from Mr. Orman at that time whether or not the book might contain pertinent information to the inquiry before the Senate, whether the answer to the question 'Where did you get the $25,000 and from whom did you get it' might be pertinent to the Senate in its inquiry under question."

We approve this charge. It was certainly pertinent under the circumstances for the Committee to seek facts which might show whether Orman was linked with unlawful interstate gambling. Although his responses might have proved that he was not, it was not his right to deny this knowledge to the Committee.

In Bowers v. United States, supra, somewhat similar questions asked a witness by this same Committee were held not pertinent to the Committee's investigation in a unanimous decision by the United States Court of Appeals for the District of Columbia. The distinction from the instant case, however, is that in the Bowers case the United States failed to produce sufficient evidence to prove the pertinency of questions not prima facie pertinent. Cf. also United States ex rel. Cunningham v. Barry, supra. Orman here might well have been justified in refusing to answer many of the early questions asked him—for example, those relating to his employment as a teenager—but once he admitted substantial income from gambling, the more detailed inquiries now before us became pertinent.

■ Orman also contends that pertinency is a question of law and as such may not be submitted to the jury. Courts have said that the question is one of law. Sinclair v. United States, supra, 279 U.S. at page 298, 49 S.Ct. at page 273; Morford v. United States, 1949, 85 U.S.App.D.C. 172, 176 F.2d 54, 57, reversed on other grounds, 1950, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815. But in Sinclair the Supreme Court explained that the "question of pertinency * * * was rightly decided by the court as one

---

4. This was testified to at the trial by Mr. Moser.

of law. *It did not depend upon the probative value of evidence.*" (Emphasis added.) In the instant case, however, evidence *aliunde* was introduced to prove pertinency. The weight and probative value of this evidence was for the jury, particularly since pertinency was an element of the criminal offense. We conclude that in this situation the trial court, taking the evidence as true, retains the power to decide that pertinency has not been established. But if the court concludes that pertinency has been proven, it is proper for it so to rule and then to submit the question and the evidence to the jury under appropriate instructions. This in substance is what the court below did.[5]

The court below interpreted rightly the law concerning pertinency. It could be urged that the language of Counts 1 and 2 of the indictment alleging *"which records were pertinent* to the matter under inquiry by the * * * Committee" (Emphasis added), was at variance from the correct view that the single issue for determination at the trial was whether the demand made for the production of records was pertinent to the matter under inquiry by the Committee. As we have stated it is immaterial that the contents of the book might prove eventually to lack pertinency to the matter under inquiry. The book was "pertinent" in the sense that it was the kind of record which under all the circumstances could be and was properly called for by the Committee. As we have said, its pertinency did not depend on its contents. Once it was established by the evidence that the demand made for Orman's book was pertinent and that he had refused compliance with this demand he could be found guilty of contempt.[6]

■ But another view properly may be taken of the allegations in Counts 1 and 2 that the "records were pertinent." These allegations can well be treated as surplusage and for this reason the United States did not have to prove them. See

---

5. During argument on Orman's motion for a directed verdict, the court below found as a matter of law the questions involved "could be" pertinent and that it was for the jury to find "whether or not they were actually so." Transcript of testimony pp. 180–181.

6. Orman's arguments respecting the scope of the subpoenas issued to him require brief discussion. As to the subpoenas calling for the production of the book of accounts, Orman argues that he was "not required to turn over the book", as charged in the indictment and did not fail to "produce" it as required by the statute. Orman seeks to distinguish between these two phrases arguing that the former goes beyond the language of the statute so as to make the indictment invalid. He says that while he did not "turn over" the book he did "produce" it by bringing it with him to the hearings and offering its contents with the proviso that they receive no publicity. We cannot accept this argument. We think the phrases are indistinguishable in this context and the resolution of authority granted to the Committee by Congress. The statute empowered the Committee to compel the production of papers and documents and to make them part of its record. This was what the Committee tried to do with Orman's book. Perhaps the Committee could not have permanently expropriated the book but no such purpose appears here.

Orman's contention respecting the difference between the meaning of the phrases "produce" and "turn over" is without merit. To carry a book into a hearing and to assert compliance with a subpoena to produce by saying in effect: "I produce the book and here it is. But you may not put it into the record.", is to render the statute nugatory. Orman's alleged right to make the production of the book conditional upon a promise not to publicize its contents is discussed at a later point in this opinion under the heading "II".

As to Orman's refusal to divulge the source of the $25,000 loan, the validity and scope of the subpoenas served on him are immaterial since he appeared before the Subcommittee without contesting the summons. See United States v. Josephson, 2 Cir., 1947, 165 F.2d 82, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122, rehearing denied, 1948, 333 U.S. 858, 68 S.Ct. 731, 92 L.Ed. 1138; Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, certiorari granted, 1948, 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, certiorari dismissed, 1949, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542.

Hall v. United States, 1898, 168 U.S. 632, 18 S.Ct. 237, 42 L.Ed. 607, and Hagner v. United States, 1932, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861. In the latter case the Supreme Court stated: "The rigor of old common law rules of criminal pleading has yielded, in modern practice, to the general principle that formal defects, not prejudicial, will be disregarded. The true test of the sufficiency of an indictment is not whether it could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.'" The principles stated were reaffirmed in Berger v. United States, 1935, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314. We applied them in United States v. Angelo, 3 Cir., 1946, 153 F.2d 247, 250. Cf. United States v. Di Carlo, supra, 102 F. Supp. at page 601.

Finally on this aspect of the case, the record is devoid of any indication that Orman was prejudiced by reason of the allegations referred to. He has asserted no error in respect to them and made no objection to the indictment on this ground.

■ Orman also suggests that the Committee went beyond the scope of any contemplated legislation and assumed the functions of a grand jury. Cf. Kilbourn v. Thompson, supra. But when the general subject of investigation is one concerning which Congress can legislate, and when the information sought might aid the congressional consideration, a legitimate legislative purpose must be presumed. See Morford v. United States, supra, and McGrain v. Daugherty, supra, 273 U.S. at page 178, 47 S.Ct. at page 330. The motives of the individual members of the Committee may not be impugned. United States v. Josephson, 2 Cir.1947, 165 F.2d 82, certiorari denied, 333 U.S. 838, 68

S.Ct. 609, 92 L.Ed. 1122 rehearing denied, 1948, 333 U.S. 858, 68 S.Ct. 731, 92 L.Ed. 1138; Eisler v. United States, 83 U.S.App.D.C. 315, 170 F.2d 273, certiorari granted, 1948, 335 U.S. 857, 69 S.Ct. 130, 93 L.Ed. 404, certiorari dismissed, 1949, 338 U.S. 883, 70 S.Ct. 181, 94 L. Ed. 542.

## II.

■ We come now to Orman's contention that it was his right to refuse to respond to the inquiries made by the Committee unless the Committee agreed not to publicize the information he would give them. As the Supreme Court in Sinclair v. United States, supra, 279 U.S. at page 292, 49 S.Ct. at page 271, has so cogently said: "It has always been recognized in this country, and it is well to remember, that few if any of the rights of the people guarded by fundamental law are of greater importance to their happiness and safety than the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of their personal and private affairs." Moreover, to "compel an individual to produce evidence, under penalties if he refuses, is in effect a search and seizure, and, unless confined to proper limits, violates his constitutional right to immunity in that regard. Boyd v. United States, [1886], 116 U.S. 616, 621–622, 6 S.Ct. 524, 29 L.Ed. 746." Annenberg v. Roberts, 1938, 333 Pa. 203, 213, 2 A.2d 612, 617. See Zimmermann v. Wilson, 3 Cir., 1936, 81 F.2d 847, 849; Id., 3 Cir.1939, 105 F.2d 583.

■ On the other hand, there can be no question of the power of Congress to undertake fact-finding inquiries in aid of legislation. McGrain v. Daugherty, supra. This necessitates some curtailment of the individual's right to be let alone, just as the efficient exercise of judicial power imposes upon private citizens a duty to submit their conduct to its scrutiny. See Landis, Constitutional Limitations on the Congressional Power of Investigation, 40 Harv.L.Rev. 153, 219 (1926). Indeed, Section 193, Title 2, U.S.C.A., recognizes that "No witness is

privileged to refuse to testify to any fact, or to produce any paper, respecting which he shall be examined by either House of Congress, or by any committee of either House, upon the ground that his testimony to such fact or his production of such paper may tend to disgrace him or otherwise render him infamous." The individual must rely, for the protection of his privacy, upon the requirements of pertinency discussed above. Where a congressional investigation enters a field to which the First Amendment is applicable, courts will be particularly careful to check unlawful lines of inquiry. Rumely v. United States, supra. But even here it must be remembered that "the right of free speech is not absolute but must yield to national interests justifiably thought to be of larger importance. The same is true of the right to remain silent. When legislating to avert what it believes to be a threat of substantive evil to national welfare, Congress may abridge either freedom." [7]  See Lawson v. United States, 1949, 85 U.S.App.D.C. 167, 176 F.2d 49, 52, certiorari denied, 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1352, rehearing denied, 1950, 339 U.S. 972, 70 S.Ct. 994, 94 L.Ed. 1379. Similarly under the Fourth Amendment: it is only "unreasonable" searches and seizures which are prohibited. See Zimmermann v. Wilson, supra. It appears, therefore, that there is in law no absolute right of privacy apart from these familiar protections. See Barsky v. United States, supra.

As shown above, the Committee had reason to investigate Orman as it did. Cf. Marshall v. United States, supra. There could be no doubt in Orman's mind as to what information the Committee desired, or the general purpose for which the Committee had been appointed. Therefore Orman is in error in claiming a violation of his right under the Fourth and Fifth Amendments [8] and of his "right of privacy" vis a vis the Committee.

There is, however, another aspect to Orman's refusals to cooperate with the Committee. As we read his testimony, his refusals were not absolute claims of right to conceal information from the Committee. He stated his willingness that the Committee should have his information provided it was not given to the public. As he testified, he was in business in Atlantic City and was therefore unwilling that the public should have access to his financial records particularly since, in his view, there was nothing in these records which could help the Committee. The condition which he sought to impose upon his responses to the Committee's inquiries seemed reasonable to him. This raises a problem quite unlike that raised by an outright refusal to give information to the Committee under any circumstances.

In general a witness before a congressional committee must abide by the committee's procedures and has no right to vary them or to impose conditions upon his willingness to testify. Eisler v. United States, supra; United States v. Costello, 2 Cir., 198 F.2d 200, certiorari denied, 1952, 344 U.S. 874, 73 S.Ct. 166. It has been held, however, that witnesses before the Senate Crime Committee properly refused to testify in a hearing room filled with television and newsreel cameras, news photographers with flashbulbs, radio microphones and a large crowd of spectators. United States v. Kleinman, D.C.D.C.1952, 107 F.Supp. 407, 408. Like Orman, the witnesses in Kleinman objected that their constitutional rights would be violated by being compelled to testify under circumstances of such publicity. But the court in Kleinman sustained their objection on the ground that the atmosphere of the hearing room was calculated "necessarily so to disturb and distract any witness to the

---

7. Quoted by the United States Court of Appeals for the District of Columbia Circuit from National Maritime Union v. Herzog, 78 F.Supp. 146, 165, affirmed, 1948, 334 U.S. 854, 68 S.Ct. 1529, 92 L. Ed. 1776.

8. At no point did Orman claim his privilege against self-incrimination.

point that he might say today something that next week he will realize was erroneous." The court further reasoned: "The only reason for having a witness on the stand, either before a committee of Congress or before a court, is to get a thoughtful, calm, considered and, it is to be hoped, truthful disclosure of facts. That is not always accomplished, even under the best of circumstances. But at least the atmosphere of the forum should lend itself to that end." The court noted that its decision was without precedent.

■ We think the Kleinman case is not persuasive here. Orman's testimony was given at a closed session of the Committee. There were no distracting circumstances alleged which might have jeopardized the accuracy and truthfulness of his answers. Orman simply feared that following the hearings of July 7 and 17, 1951, his testimony would be given to the newspapers, as it apparently had been at the close of the session on July 6, 1951. We cannot see that this fear would affect his ability to give the information requested. It would certainly have nothing to do with his ability to produce his 1951 book of accounts.

■ Orman insists upon his right to make what was called a "closed" session of the Committee, a closed session in fact. He urges the court to take judicial notice of the purpose of the Committee to obtain maximum publicity for all its hearings, regardless of the nature of the information received. This brings before us the question of the extent to which a court can and should regulate the procedures of a lawful congressional committee making pertinent inquiries. As we have said, the individual motives of the members of such a committee cannot be impugned. On the other hand, there is much to be said for a cooperating witness' right to demand that infor-

mation which cannot aid the committee in its legislative purpose be withheld from the public. We conclude, however, that this is a matter for legislative rather than judicial control. Unless a court were to receive the entire record of a committee's hearings, it would be almost impossible to tell which items of testimony should properly be included in the committee's report to Congress, or otherwise publicized, and which should not. It might well be proper for the committee to report, over the objection of the witness to this publicity, that certain persons, previously suspected, were *not* connected with the matters investigated, and to give reasons for this conclusion. The Senate Crime Committee was authorized to ascertain the identity of persons using the facilities of interstate commerce in furtherance of criminal activities. Orman cannot be permitted to prevent the Committee from reporting its investigation of him, and including his testimony in its report.

The Committee was entitled to refuse to accept Orman's condition *before* it knew what information Orman had to give. As we have said, this is not a case where the inquiries themselves were not pertinent. Perhaps it would be desirable for Congress to limit the newspaper and television publicity given to the testimony of witnesses—we believe that in some investigations this has been the practice—but in accord with the Eisler and Costello cases, supra, we hold that a court will not enforce a condition imposed upon committee procedure by a witness, at least where no circumstances appear which might affect the ability of the witness to give clear and truthful testimony.

We conclude therefore that Orman's refusal to identify the source of the $25,000 loan was deliberate and intentional.[9] His claim of a right of privacy was no justification under the circumstances at bar.

9. Orman does not contend that the Committee did not inform him that his answers were unsatisfactory and did not give him an opportunity to abandon his ground for refusal. Cf. Bart v. United States, 1952, 91 U.S.App.D.C. 370, 203 F.2d 45.

### III.

One problem remains, which we raise of our own accord, for it is not set out in Orman's grounds for appeal. The court below imposed a twelve months sentence on Counts 1 and 3, the terms to run concurrently, and suspending imposition of sentence on Counts 2 and 4, placed Orman on probation for one year, the terms of probation to run concurrently, and to commence at the expiration of the sentences imposed on Counts 1 and 3. The statute under which Orman was tried and was found guilty is set out in note 3, supra. It provides for punishment both by fine and imprisonment but specifies that the imprisonment shall not be less than one month nor more than twelve months.

We must now consider whether there was not a multiplying of penalties by the sentences imposed for what are not in substance more than two separate contempts. Where there are separate refusals to produce documents or to answer separate questions it is proper for each refusal to be set forth in a separate count of the indictment. United States v. Emspak, D.C.D.C.1950, 95 F.Supp. 1012. But where the separate questions seek to establish but a single fact, or relate to but a single subject of inquiry, only one penalty for contempt may be imposed. See United States v. Yukio Abe, D.C.Hawaii 1951, 95 F.Supp. 991, 992. Cf. Trumbo v. United States, 1949, 85 U.S.App.D.C. 167, 176 F.2d 49, certiorari denied, 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1353, rehearing denied, 1950, 339 U.S. 972, 70 S.Ct. 995, 94 L. Ed. 1379; Fawick Airflex Co. v. United Electrical Radio & Machine Workers of America, Ohio App.1950, 92 N.E.2d 431; People ex rel. Amarante v. McDonnell, Sup.1950, 100 N.Y.S.2d 463. Where the witness has refused to give any testimony, a committee cannot multiply his contempt by continuing to ask him questions each time eliciting the same answer. United States v. Costello, supra. Counts 1 and 2 and Counts 3 and 4 concern different phrasings of two questions. Orman's refusal to produce the book and to answer each form of the question as to the source of the $25,000 does not amount to four contempts. It follows, therefore, that Orman can legally receive but two sentences, each not in excess of the statutory maximum. The court, however, has imposed two penalties: one, a sentence of twelve months imprisonment, and two, a year's probation commencing at the end of the twelve months imprisonment.

As we have said, Counts 1 and 2 were based on refusals to produce the book. Counts 3 and 4 were based on refusals to respond to questions respecting the $25,000 loan. The court selected Count 1 (book) and Count 3 (loan) for the imposition of the maximum prison sentence prescribed by the statute. In doing so the court exhausted its sentencing power and could not—at least under the form of its existing judgment—impose probation. The court intended to impose a prison sentence of twelve months on Orman and to put him on probation for one year following the expiration of his prison term. The sentence of probation imposed is illegal for as we have said the court had no sentencing power left.

Accordingly, we will affirm the judgments of conviction on all four counts and will affirm the judgments of sentence on Counts 1 and 3. To clear the record we will vacate the judgments of sentence on Counts 2 and 4. These are nullities since the court was without the power to impose them.