### UNITED STATES of America
### v.
### Leon J. KAMIN.
### Crim. No. 54–389.

United States District Court
D. Massachusetts.
Nov. 2, 1955.

---

John M. Harrington, Jr., Arthur I. Weinberg, Asst. U. S. Attys., Boston, Mass., for plaintiff.

384

Calvin P. Bartlett, John L. Saltonstall, Jr., Boston, Mass., for defendant.

ALDRICH, District Judge.

This is a prosecution under Title 2 U.S.C.A. § 192 for refusal to answer questions propounded by a Congressional committee, in this instance the Permanent Subcommittee on Investigations of the Committee on Government Operations of the Senate, hereinafter called the Subcommittee. On January 15, 1954, the defendant, a former teaching fellow, and then a research assistant at Harvard University, was called before the then Chairman of the Subcommittee, sitting as a committee of one, and asked a number of questions. In answer to some he disclosed that he had formerly been a Communist. Six other questions he refused to answer, for which refusal he was subsequently indicted on six counts. At the close of the government's case, tried without jury on motion of the defendant with the consent of the government, the defendant moved for acquittal. I do not pass on that motion at this time so far as it relates to the entire indictment, but will consider some of the individual counts.

■■■ The six counts fall into three groups of two. Counts 1 and 3 to a considerable extent are substantially the same question; Counts 2 and 6 are essentially identical; and so are Counts 4 and 5. Although it may have been entirely proper to indict on all six counts, I do not think it appropriate, to the extent that they involve the same question, that the defendant should be convicted separately on each one of them. United States v. Orman, 3 Cir., 207 F.2d 148, and cases cited. There the court said, 207 F.2d at page 160, "Where the separate questions seek to establish but a single fact, or relate to but a single subject of inquiry, only one penalty for contempt may be imposed." All doubts as to the coincidence of the questions should be resolved in the defendant's favor.

Of the similar questions involved in Counts 1 and 3 the one more favorable to the government is Count 1, as follows:

Count 1. Whether or not individuals known to him to have been members of the Communist party are now working in defense plants.

The defendant has stipulated that this question may for all purposes of this case be construed as calling for the names of the persons therein inquired about,[1] thus removing a possible objection of lack of pertinency which might be made if the question asked only for a "Yes" or "No" answer. I will, accordingly, dismiss Count 3.[2]

Of the pair of questions contained in Counts 4 and 5 the one more favorable to the government is Count 5.

Count 5. Did he know whether Emanuel Blum had contacts with people handling government classified material. I will therefore dismiss Count 4.[3]

1. This stipulation removes the necessity of considering whether, because of the fact the defendant refused to answer the question on the ground that he would not "establish the identity of any person or persons with whom [he] was associated," he could now say, had there been no stipulation, that the question did not call for names. Cf. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884.

2. Count 3 reads, "Would he give the names of the Communists who were active with him in the Communist party." To the extent that this question called for more information than that requested by the first as now defined in the stipulation, that is, to the extent that it called for

the names of Communists who were *not* engaged in defense activities, it could pose a serious problem of pertinency to the subject matter of the inquiry. See discussion, *infra*, on Count 2. The government, therefore, is on safer grounds to proceed solely on Count 1.

3. Count 4 of the indictment reads, "Does he know Emanuel Blum." (The actual question was, "Did you know Emanuel Blum?" In view of the possible ambiguity as to the period covered by the Count 2 question, discussed *infra*, it is interesting to note this interchange of tenses by the government.) There is serious doubt in my mind whether a question limited

I turn now from matters of form to a matter of substance.

Count 2 alleges that the defendant refused to answer a question described in the indictment as follows:

Count 2. Did he know anyone teaching at Harvard or connected with Harvard who was either in his Communist cell or known by him to be a Communist. This is a sufficiently accurate statement of the question in fact asked, which was,

"Did you know anyone teaching at Harvard or connected with Harvard, who were either in your Communist cell or known to you to be Communists?"

The defendant refused to answer on the stated grounds that he was unwilling to act as an informer in identifying other persons, and on the grounds of his conscience and the First Amendment.

I pass the possible defect in the phraseology of the question, "Did he know anyone * * *" although I still have in mind Bowers v. United States, 92 U.S.App.D.C. 79, 202 F.2d 447, at page 452, supra, note 3, where it was suggested that a question which merely asked whether the witness knew a person could never be a pertinent inquiry. For present purposes I shall assume in favor of the government that the question was in reality intended to ask for names, and shall consider its pertinency on that basis. Even so the question is not a simple one. In the first place it is not clear as to what period of time it relates. The preceding question was,

"Do you know professors at Harvard who were in your Communist cell?"

This was cast clearly in the present tense. The defendant answered this question, using the past tense.

"I don't want to appear to weasel, Senator, but I didn't know any professors. No."

Either the defendant then had some period of time in mind, and subsequently felt that the next (Count 2) question incorporated it, or he felt that the past included the present (see footnote 3, supra), or he was satisfied, so far as Count 2 question was concerned, not to particularize the period of time. In any event, I will assume that he cannot now be heard to say that the specification of time was too vague.[4] I shall also assume, without deciding, that the Subcommittee had the right to inquire into the past as well as the present, and for the period that this question covered. Accordingly, the defendant cannot say that he fully answered the question later when he in effect stated that when he appeared before the Harvard Corporation he "knew of no member of the Harvard faculty who was at that time a Communist." This did not cover, even substantially, the minimum period encompassed by the present question.

The Count 2 question referred to two classes of persons,—those who were "teaching at Harvard," and those who were simply "connected with Harvard." It is a familiar principle that if there are two parts to one question, both must be pertinent. Belk v. Meagher, 104 U.S. 279, 26 L.Ed. 735; 58 Am. Jur. 317. The government, accordingly, could not complain if it were held that this question is to be tested in the light more favorable to the defendant; in other words, that both matters inquired

to one's acquaintance with another individual can ever be pertinent. Cf. Bowers v. United States, 92 U.S.App.D.C. 79, 202 F.2d 447, 452. In any event, the meat of the inquiry is contained in Count 5, and I think it wiser to proceed on that count alone.

4. It is still not easy to determine what period of time was reasonably called for

by the question. It might be fair to construe the question as covering the entire period commencing with the defendant's original connection with the Communist party, which he had stated to be in the fall of 1945, down to the date of the hearing. In all events it certainly covered the duration of his membership in the party, which he stated was from the fall of 1945 to the fall of 1950.

about must be pertinent. I believe this would be the proper rule for me to follow, particularly for hearings where, as here, the witness' counsel is not permitted to voice objections. Nonetheless, for present purposes I will make another assumption in favor of the government, namely, that the defendant should have answered if it was appropriate to ask him either portion of the question,— either as to teachers at Harvard, or as to anyone connected with Harvard, known by him to have been Communists. I shall start with teachers.

The presently material portion of § 192 makes it a misdemeanor to "[refuse] to answer any question pertinent to the question under inquiry" by any Congressional committee, within, of course, the scope of its authority. In this case documentary evidence as to the subject matter of the inquiry is lacking. The Chairman testified that the Subcommittee orally "decided to hold hearings on infiltration in defense plants." (R. 97). He amplified this by saying he meant "Communist infiltration of defense establishments * * * subversion and espionage." (R. 99). He amplified this further, saying, "We were investigating the efficiency of the organization which was responsible for handling security matters in defense plants." (R. 100). He stated that he told the Subcommittee,

> "We were not going into an investigation of Harvard as a university or as an educational institution, but rather because of the defense work that these two professors had been doing." (R. 104).

> "I emphasize we were not investigating Harvard." (R. 113).

All of the above testimony came on direct examination as part of the government's case. Whatever it may have established with relation to investigating defense work at Harvard, it is quite apparent that it did not extend to the broad subject of teaching at Harvard. Indeed, the Chairman conceded as much

on more than one occasion. In addition to the previously quoted testimony of what he initially stated to the other members of the Subcommittee, which statement, so far as the record shows, may be taken as his maximum grant of authority, he testified as follows.

"The purpose was not to investigate Harvard University." (R. 143).

"Fifth Amendment Communists * * * teaching the young people of our nation * * * is viciously wrong * * * I would like to see some committee expose it if it is true that Harvard is implicated. Accidentally we found two. My committee is not doing that job * * * that was not my task." (R. 162–3).

"Any institution that harbors Fifth Amendment Communists should have that fact exposed * * I was not doing that job, I never took on that job." (R. 166).

The government called as its principal witness, so far as the Harvard questions were concerned, one Reynolds, administrative vice-president of the University, who testified as to Harvard's defense contracts over the ten years or more prior to the Subcommittee hearing. His evidence indicated, and I find, that during each of these years Harvard did considerable research work under contract for the federal government; that during the war years most of this work was of a "classified or restricted" nature;[5] that little or no such work was undertaken from and after January, 1946 and none after June, 1946, and that by June, 1946 only a smattering of such work remained unfinished. The witness testified that this government work was not particularly departmentalized so far as the University was concerned, but was done by members of various departments of Arts and Sciences, the Business School, the Medical School, and the Schools of Public Health and Public Administration.

---

5. For definition see footnote 6, infra.

Even if all of the witness' testimony related to classified work, which was not clear, it left large segments of Harvard's teaching staff entirely out of the government orbit. The Schools of Design (Architecture), Divinity, Education, and Law come to mind. Nor can it be easily assumed that all members, or even every separate department of the sizeable faculty of Arts and Sciences, from archaeologists to zoologists, were capable of working on classified government material. At least if this were so, the government, on whom rests the burden of proof, offered no such evidence. Yet the Chairman testified on direct examination with respect to the question set forth in Count 2, as follows.

"Q. What information did you have which was the basis for that question? A. We knew that Harvard was doing considerable defense work, research, etc., and were curious to know whether or not Communists were handling the United States secrets. I should say United States classified material.[6]

"Q. What information did you desire to obtain by that question? A. I wanted to find out from him whether or not he would give us the names of the Communists who were working in defense work, handling classified material." (R. 111–112).

In the light of this positive testimony I am not faced with the question of whether it might be within the authority of the Subcommittee to investigate defense work at Harvard of an unclassified nature. In passing, however, I note the fact that of the four members of the Subcommittee who are claimed to have sanctioned any investigation at Harvard, none recall doing so except the Chairman, whose testimony, the most favorable to the government, was that he told the Subcommittee Harvard was to be investigated only "because of the defense work that these two professors[7] were doing." (R. 104). On the government's evidence this work was classified, or security work. (Exhibits 1 and 15). Furthermore, it is obvious that Harvard, being an educational institution, had many more activities than a "defense plant." It might be quite appropriate for the Subcommittee to feel that the investigation at Harvard should be of a more restricted nature than at a strictly business establishment, and as the above testimony of the Chairman indicates, be limited to the more serious aspect of Communists in security work as distinguished from ordinary unclassified defense work. This, too, makes it unnecessary for me to consider, a matter on which I express no opinion, whether the mere presence of Communists in defense work which has no security features to it, is within the jurisdiction granted by the Senate to the Committee on Government Operations.

For reasons previously stated, even if the Count 2 question as to teachers had been limited simply to the war years, it is apparent that it embraced a very much wider group than those engaged in the defense work in which the Subcommittee professed interest. But the question called for far more, even, than that. It asked for the identity of every Communist member of the faculty perhaps down to January, 1954, the date of the hearing, or, in any event, down to the fall of 1950,[8] although Harvard had done no classified work since 1946. The other half of this question, which covered the same period, substituted for teachers "anyone * * * connected with Harvard" who had ever been Com-

---

6. The "classified" work, done by Harvard during the war, was of a "low order of security" (R. 260), as distinguished from "secret" and "top secret." (R. 261).

7. It is clear that by this the witness was referring to Kamin and Furry, although at the time that the former was engaged

—in some fashion that does not appear— in a government classified project, he was an undergraduate doing summer work, and he never reached the rank of even assistant professor.

8. See note 4, supra.

munists.[9] This was even more extensive. In its normal meaning "connected" would seem to include all employees of the university of every kind, rank or position. I assume, also, that every student attending courses may properly consider himself connected with Harvard.

Under these circumstances it is apparent that a question asking for the names of every person known to be a Communist who was then teaching, working or studying at Harvard, or had been to the defendant's knowledge at some period in the past, which period covered at least four years when Harvard had had none of the classified defense work in which the Chairman testified the Subcommittee's interest lay, was so manifestly outside the admitted scope of the inquiry, both as to persons and as to time, that I am surprised the government has required the defendant to stand trial on his refusal to answer. It is difficult to imagine how a question could be more aptly phrased to cover the entire subject of Communism at Harvard, which the Chairman denied was his "task", and less fitting to elicit from the defendant "the names of the Communists who were working in defense work, handling classified material," the testified-to object of his inquiry. (R. 162-3; R. 111-12).

I will deal with the government's arguments. In the first place, it is insufficient for government counsel to suggest that the Subcommittee may not have known the extent of Harvard's government work. The Chairman who asked the questions did not testify to any such ignorance, if ignorance would have been a justification. A government witness testified to a matter I would have thought obvious, that there was little doubt that the appropriate contracting officers of the various armed services knew as early as 1946 that Harvard had discontinued all classified work. If the Subcommittee, in preparing itself for the investigation learned, as it did, of Harvard's government work, I will not assume that it did not learn the general nature of it, or, roughly, the period over which it extended.

Nor is it sufficient to state that an answer to the Count 2 question might conceivably have disclosed information pertinent to the matter under investigation. It is only too apparent that such answer might instead have called forth the names of any one or more of literally thousands of other persons, not only of teachers whose connection with the university originated long after all classified government defense work had ceased, but of every wage employee, from attendants to waitresses, who had no, and had never had any, possible connection with such work. The government seeks to answer this by saying that in United States v. Orman, 3 Cir., 207 F.2d 148, the court said that the test of the pertinency of the question was whether a "possible" answer would be pertinent. This statement must be read in the context in which it was made. The defendant there was contending that if the actual answer he would have given would not have been pertinent he could not be convicted for failure to answer. The court properly pointed out that the test of pertinency is the possible answer, not the answer that would have been evoked in one particular case. This is no contradiction of the requirement that to be a pertinent inquiry the question must call for a possible answer reasonably responsive to the scope of the question. If, for instance, the only matter pertinent to the inquiry was whether a witness' father was a Communist, I believe it would be quite improper to require him, at the expense of a criminal penalty if he refused, to state the name of every person who had ever been known to him to have been a Communist, even though, of course, that might have included his father among the others.

---

9. This half of the question and the entire Count 6 question are essentially identical, except that Count 6 by reference does define the period covered as being from the fall of 1945 to the fall of 1950.

The government argues that it may sometimes be desirable to ask such a broad question, so as "to appear to a hostile witness to be heading east, when in reality one is heading west." That may be. But that does not mean that a "heading east" question is pertinent, as the word is used in the statute, to an inquiry that is "heading west." As the court said in the Bowers case, supra, 202 F.2d at page 448,

"It may often be proper, justifiable and ultimately helpful in the accomplishment of its investigative purposes for a Congressional committee to address to witnesses questions which it cannot demonstrate to be pertinent. But in branding a refusal to answer as a misdemeanor, Congress was careful to provide that the question must be 'pertinent to the question under inquiry.' It follows that, when a witness refuses to answer a question and the government undertakes to convict him of a criminal offense for not answering, then pertinency must be established."

It is axiomatic that a criminal statute must be strictly construed. United States v. Resnick, 299 U.S. 207, 57 S.Ct. 126, 81 L.Ed. 127. The suggestion made in argument that a hostile witness could be asked an apparently impertinent question, or one in which any possible pertinence was remote, so that he would be lulled into answering it, may be good trial tactics, but it does not fall within the statute.

I will not hold that a question primarily directed to pertinent material is necessarily defective merely because it can be interpreted to include incidentally something irrelevant. This may be a matter of degree. But the Subcommittee had no right to engage in a general " 'fishing expedition * * * for the chance that something discreditable might turn up' * * *—an undertaking which uniformly has met with judicial condemnation."[10] Jones v. Securities Commission, 298 U.S. 1, 26, 56 S.Ct. 654, 662, 80 L.Ed. 1015. Where its question's principal thrust was aimed broadside at subjects entirely removed from any possible field of legitimate inquiry, it would be quite improper for the court to uphold it simply because of the incidental presence of the matter to which it should have been directed. The defendant had no right to withhold pertinent information. Equally, the Subcommittee had no right to require him to reveal obviously impertinent information. The Chairman testified, and I find, that he was an experienced examiner who knew how to ask what he intended. The clear burden on the Subcommittee, if it was going to prefer criminal charges, was to formulate its questions so that they would fall, at least approximately, within the scope of the known limits of its authority. The government's own evidence, so far as Counts 2 and 6 are concerned, shows that this fundamental principle was not observed. The defendant, accordingly, must be acquitted on these counts.

With respect to Counts 1 and 5 I do not pass on the defendant's motion at this time, and will hear the defendant's case. Crim.Rule 29(a), 18 U.S.C.A.

10. A fishing expedition would seem a proper description of the government's contention that a question is pertinent if an answer might reveal further sources of information which, if pursued, might eventually lead to a pertinent inquiry. It is difficult to think where pertinency would not exist under such a definition.