UNITED STATES of America

v.

Leon J. KAMIN.

Crim. No. 54–389.

United States District Court
D. Massachusetts.

Jan. 5, 1956.

Anthony Julian, U. S. Atty., John M. Harrington, Arthur I. Weinberg, Asst. U. S. Attys., Boston, Mass., for plaintiff.

Calvin P. Bartlett, John L. Saltonstall, Jr., Boston, Mass., for defendant.

ALDRICH, District Judge.

This is a prosecution under 2 U.S.C.A. § 192, tried without jury, for refusal to answer questions put by the Senate Permanent Subcommittee on Investigations, hereinafter called the Subcommittee, of the Senate Committee on Government Operations, hereinafter called the Committee. Reference is made to the earlier

opinion herein, reported in D.C., 135 F. Supp. 382, in which the indictment was reduced to two counts at the conclusion of the government's case. Thereafter the defendant introduced evidence.

I find on all the evidence that the defendant deliberately refused to answer the questions involved in the remaining two counts of the indictment. He answered all questions concerning his own Communist activities, but on the stated grounds that his conscience did not permit him to be an informer, and on the First Amendment, enlarged at the trial to include the Fourth, Fifth and Ninth Amendments, he refused to give like information about others.[1] There is, in my opinion, no basis in law for drawing such a distinction. If Congress is entitled to information, it does not have to go to original sources. On the other hand, the defendant is not to be charged, whether his given reasons were good or not, if the Subcommittee was not authorized to conduct this particular inquiry, or if the questions asked were not pertinent to the subject matter thereof. The burden of proof on these matters is on the government. Sinclair v. United States, supra, note 1; Bowers v. United States, 92 U.S. App.D.C. 79, 202 F.2d 447; cf. Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150, rehearing denied 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731.

The subpoena to attend the hearing in Boston was served on the defendant at 11 A.M. on January 14. The date and hour he was to appear was not written in, but he was told by the Deputy Marshal making the service to appear at 9:30 the next morning. At 4:00 P.M. on January 14 he retained present counsel, and conferred with him until 6:00. During this consultation he prepared two drafts of a statement. A few changes were made the following morning, and thereafter the de-

fendant and his counsel went to the Federal Building, where they were directed to the lobby of Courtroom 3. After they were seated the Chairman of the Subcommittee and his staff entered the room. A number of others did, also. I find that the room, which was small, was overcrowded, and that during the so-called executive hearing, which commenced shortly, there was some coming and going by persons other than the Subcommittee and its staff, and a certain amount of confusion.

The executive hearing consisted of an examination under oath of the defendant, partly by the Chairman, the only member of the Subcommittee present, and partly by its counsel. The typewritten transcript was introduced in evidence by the defendant. After one page of examination he was asked to name the other members of a Communist club to which he had said he formerly belonged. He conferred with his counsel, who thereupon announced that the defendant would refuse "divulging names of individuals on the grounds of his conscience, on the grounds of the First Amendment." He testified at the trial that this announcement met with his approval when made. The written statement he had prepared the day before, and thereafter read, constituted an elaboration of that position. At the trial, however, he testified that he had not made up his mind in advance of the hearing, and that his decision was to depend upon events. This testimony was at best an idealization which may have grown in recollection with the passing of time. It did not impress me. I find that although the conditions of the executive hearing were not to his liking, they were not the cause of his refusal to answer. Whatever his motives and objections, he had decided before entering the building, in accordance with his prepared state-

---

1. In spite of defendant's extensive arguments I am not satisfied that he has any valid constitutional point. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344, rehearing denied 341 U.S. 912, 71 S.Ct. 619, 95 L.Ed. 1348; Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692; Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, certiorari denied 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767, rehearing denied 339 U.S. 971, 70 S.Ct. 1001, 94 L.Ed. 1379.

ment, not to answer questions along certain lines however they were asked.

■■ ·There was no occurrence of any procedural or formal nature at the public hearing thereafter held in the open courtroom that justified the defendant's refusal to answer questions. Even if, as he contends, certain conditions there may have violated procedural rules of the Subcommittee as to the method of conducting hearings, this would be immaterial, where they did not contribute to his determination not to answer.[2] A Congressional hearing need not be conducted like a court proceeding. Nor, in the absence of complaint by him at the time, should these matters be now considered. This is not a prosecution for perjury, where a defendant might show he was so unprepared, or so distracted, that any false testimony was due to inadvertent error. His conduct here was premeditated and intentional, and for him to raise at this date procedural objections that he in no wise asserted at the time is reminiscent of the situation in United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, rehearing denied 339 U.S. 991, 70 S. Ct. 1018, 94 L.Ed. 1391. I find such defenses quite out of keeping with the asserted motives of conscience in his prepared statement at the hearing[3] and I find and rule that they are not valid.

2. The defendant testified that the whispering audience, photographing, television and other conditions at the public hearing "had an effect upon [his] functioning properly as a witness." He did not explain what this meant, unless it was an implication that it caused him to refuse to answer these particular questions. He answered fully many others. These he had already positively rejected at the executive hearing, and I decline to draw any such inference, even if, which I doubt, it might be warranted. As to Committee Rule 9, which required a witness' statement, if any, to be filed with the Committee twenty-four hours in advance, this was a rule for the benefit of the Committee. In this case it was waived, and the defendant permitted to read the statement he brought with him. The rule is not to be read in reverse as imposing an obligation on the Committee to give a witness twenty-four hours' notice of the hearing.

3. It appears that when previously questioned by another Congressional committee, the Jenner Committee, the defendant had declined to answer under the Fifth Amendment. For this he had been censured by Harvard University, his employer, and may well have been criticized by others. I believe he declined to act as an "informer" at the present hearing so that his previous associates would not by his actions be placed in a similar position. Such motives, being legally insufficient, do not mean that his refusal to answer was not willful in the ordinary criminal sense. Insofar as the opinion in United States v. Lamont, D.C.S.D. N.Y., 18 F.R.D. 27, 30, may suggest that the word "willfully," used in § 192 in a perhaps more specific sense with reference to failure to respond to a summons, also modifies "refuses to answer", I do not agree with it. All that the court pointed out in Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, was that a failure which was unintentional, or based on a misconception, might fall short of a positive refusal. This is not because of the presence of the word "willfully" elsewhere in the statute, but because the normal meaning of "refuses" is conscious, deliberate declination. Motives beyond that are immaterial. United States v. Josephson, 2 Cir., 165 F.2d 82, certiorari denied 333 U.S. 838, 68 S.Ct. 609, 92 L.Ed. 1122, rehearing denied 333 U.S. 858, 68 S.Ct. 731, 92 L.Ed. 1138; United States v. O'Connor, D.C. D.C., 135 F.Supp. 590.

While on the subject of the Lamont case, and because the matter is vital to the support of the present indictment, I might state that I do not find that case persuasive. (1) For the reasons already referred to, because it held the indictment insufficient without the further word "wilfully," or, seemingly alternatively, "deliberately." (2) Because it held that the Committee's authority must be specified in the indictment with particularity. It is interesting to note that the court held the bare allegation that the "questions * * * were pertinent to the question then under inquiry" was a sufficient allegation of that necessary aspect of the case. If a bare allegation of pertinency is sufficient, cf. Markham v. United States, 160 U.S. 319, 16 S.Ct. 288, 40 L.Ed. 441; Woolley v. United States, 9 Cir., 97 F.2d 258, certiorari denied 305 U.S. 614, 59 S.Ct. 73, 83 L.Ed. 391, I see no reason for particularizing the details of authority beyond a reference to the statute. United States v. O'Connor, supra.

■ The first defense of substance is that the Subcommittee had not delegated to the Chairman any authority to pursue an investigation. This is a question of fact, on which oral testimony was introduced of the four majority members of the Subcommittee who were active at the time the authority was said to have been granted. The defendant attacks their testimony, or its effect. While their recollections were not complete I have no doubt that these majority members (the minority had either resigned, or given such notice of proposed abstention that their absence was immaterial), met together in June or July, 1953, that after discussion the Chairman stated he proposed to conduct an investigation, and that the proposal received what all present understood to be unanimous approval. I find and rule that this was sufficient Subcommittee action.

■ The defendant states that even if this occurred no powers had been granted by the Committee to the Subcommittee during the 83rd Congress. I do not agree. A somewhat similar point was felt not worthy of elaboration in Maragon v. United States, 87 U.S.App.D.C. 349, 187 F.2d 79, certiorari denied 341 U. S. 932, 71 S.Ct. 804, 95 L.Ed. 1361. In addition, I find that the Committee had known for a number of months that the Subcommittee, after receiving a liberal allowance of funds, was extensively engaged in conducting these hearings, and by its conduct gave implementation, if any were needed.

■ Nor do I agree that Rule 4 requiring Subcommittee, or Committee, approval of public hearings had not been complied with. The "major" investigation considered and approved at the June or July, 1953 meeting was of such nature that it included, to the understanding of all, public hearings as a matter of course. The fact that public hearings were going on was subsequently called to the attention of the full Committee at a meeting or meetings prior to January 15, 1954. In addition, notice of individual hearings was given in advance to each Subcommittee member in time for him to have disapproved of any specific hearing had he wished. This was sufficient compliance.

Although I am clear that the majority members met and approved of an investigation, it is not so clear just what investigation they approved. As related in my earlier opinion, the court has before it no written records of meetings in 1953, and is dependent upon oral testimony. Before discussing this testimony it would be well to examine the government's contentions with regard to it.

Several months prior to trial the government was ordered to specify the subject matter under inquiry. The pertinent portion of the bill thereafter filed is quoted below.[4] It was alleged that there were three main areas of investigation, (1) departments and agencies within the government, (2) outside defense plants employed by government departments and agencies, (3) educational institutions engaged in research for government departments and agencies. While the sub-

---

4. "The subject matter was the determination of the existence and extent of subversion and espionage (1) in departments and agencies of the executive branch of the United States government, (2) in industrial concerns, plants, laboratories and establishments engaged in defense production and research for departments and agencies of the executive branch of the United States government, involving the expenditure of United States government funds, and (3) in educational institutions engaged in research and development projects for departments and agencies of the executive

branch of the United States government, involving the expenditure of United States government funds, insofar as such subversion and espionage affected, or might tend to affect, the economy and efficiency of the operation of the departments and agencies of the executive branch of the United States government, and the operation of the activities of the United States government in defense production and research as carried on in said industrial concerns, plants, laboratories and establishments and in research and development as carried on in said educational institutions."

sequent limitation or explanatory clauses commencing with "insofar as" are not similarly numerically subdivided, they are in a triple, seemingly symmetrical arrangement. It is not plain whether the investigation of (2) defense plants (the only matter now before the court), was for the second, or was for all three purposes set out. In other words, I am uncertain whether it was to determine the economy and efficiency of the operation of government agencies and departments themselves. This is a distinction of some possible importance, as will be developed later.

This ambiguity in the bill of particulars was not cleared up in oral argument. In his final remarks government counsel stated,

"I say the scope of the inquiry was the existence of subversion and espionage in defense plants and establishments, and of course the purpose of that was as it relates to the efficiency and the *operation of government*." (Italics supplied.)

In a brief thereafter filed the government said,

"The subject under inquiry at the time that the defendant was asked the questions he refused to answer was subversion and espionage in defense plants and establishments."

It continued,

"The chairman testified further that in the investigation the committee was primarily concerned with security regulations and how they were operating and whether additional legislation was necessary. With regard to the committee's interest in security rules and regulations, taking the chairman's testimony as a whole, the only fair conclusion is that in the investigation of subversion and espionage in defense plants and establishments a primary area of interest and importance was the functioning of security regulations, rules, and legislation and the administration of same."

I take it that this last excerpt is an indirect assertion that the investigation was of the operation or effectiveness of defense security agencies and their rules and regulations, rather than a study of the operation of defense plants. Whether that is what the Chairman investigated I will discuss later. Of greater importance is the question of whether that is the investigation the Subcommittee approved.[5] This I will now consider.

The only authority specifically granted the Chairman was conferred on him at the June or July, 1953 meeting. The hearings held as a result of this were, with a few exceptions not shown to be relevant to the present question, conducted in various parts of the country by him alone, as a committee of one. The other members were busy with important matters of their own, and did not purport to follow his activities in any detail. Accordingly, both in fact and in law, the mandate, that is to say, the legal limits, of his authority to conduct the hearing in connection with which the defendant is indicted, depends upon what was done at that meeting, and not on later events.[6]

5. The mere fact that it was done does not, of course, prove that it was authorized to be done. There is no presumption of authority. Schutz v. Jordan, 141 U.S. 213, 11 S.Ct. 906, 35 L. Ed. 705; *United States v. 40,438 Square Feet of Land*, D.C.D.Mass., 66 F.Supp. 659.

6. For example, none of the other members knew of that aspect of the investigation that the Chairman subsequently sought to make at Harvard which I have found in my previous opinion deliberately exceeded the known limits of his authority. In fact, they had been told the investigation there would not be along those lines. 135 F.Supp. at page 386. One of the members testified that he did not know, and another that he knew only from a newspaper item, of the Chairman's attitude toward the president of Harvard, although the record shows that on a number of occasions in the course of the hearings, or in connection therewith, the Chairman's remarks on that subject were anything but flattering. Whether his criticisms were justified or not is a matter with which I have no

The government's first witness was the 1953–1954 counsel for the Subcommittee. He gave no evidence as to what took place at the meeting. While he testified to discussing, presumably some time later, the "general subjects of investigation" with all of the majority senators, this testimony merely shows these senators knew generally of the investigation, and does not help to particularize it.

The next witness was the Subcommittee's stenographic reporter. He testified that the first Boston hearing, held November 19, 1953, was introduced by the Chairman with the following statement:

"The purpose of this hearing this morning is to continue the investigation of the alleged Communist infiltration and espionage in various plants having to do with Government work, especially work for the Defense Department. The first witness this morning will be * * *."

The next witness was the Chairman. He testified that the Subcommittee in, he, thought, July, 1953, "met and decided to hold hearings on infiltration in defense plants, I should say defense installations." [7] This was his entire evidence with reference to that meeting. He testified that on January 11, 1954, there was a meeting of the full Committee, at which all the majority Subcommittee members were present, and that he stated at this meeting that he was going to call the defendant "in connection with defense plant infiltration by Communists." The record has nothing more explicit from this witness as to what subject matter of investigation the majority members of the Subcommittee knew of, or approved.

Thereafter, the three other majority members of the Subcommittee testified. I have scrutinized their evidence with care—in fact, before two of them left the stand I asked questions to permit them to amplify it—and I am unable to find that they authorized, or even contemplated, an investigation of the operations of government departments and agencies which dealt with, or were responsible for contracting with, defense plants and industry. The inquiry they authorized was of subversion and possible espionage in defense plants and industry, but it was in another connection.

I believe that what took place at this meeting is plain. An investigation of subversion was suggested by Senator Mundt. Senator Mundt, from his experience on the House Committee on Un-American Activities, knew that Communists were effective penetrators, and he was anxious to get rid of them. The other members agreed. The best method, and the only practical method so far as

concern, but it is illustrative of the difference in scope of the Chairman's activities and the knowledge of the other members of how he was proceeding. To the extent that the actual investigation exceeded, if it did, the Chairman's original grant of authority, there is no ground for claiming ratification by the other members of the Subcommittee, because there was no proof that they had sufficient knowledge to form a basis therefor.

7. The witness did not explain what he meant by this correction. So far as I can discover, the first hearing having to do with defense plants in the sense of private industry was the one held November 19, 1953, the Chairman's introduction to which was quoted above. Precisely what investigation that was being "continued" from he did not say, but examination of all the transcripts printed by the government of the Subcommittee's

preceding 1953 hearings indicates that the previous hearings were of subversion in Army installations. The title given the November, 1953, and the defendant's hearing in January, 1954, in the stenographic transcript of the testimony was "Subversion and Espionage in Defense Installations." In the Committee's annual report to the Senate filed immediately after the January, 1954 hearing at which the defendant appeared, there were four pages under the heading "Subversion in Defense Effort." These treated together subversion in "Army * * establishments" and in "defense establishments," (the latter clearly meaning defense plants). For these and other reasons discussed in the body of this opinion, I do not believe that in the Subcommittee's mind here was ever any real separation between these studies, the only difference being the area of search, not of objective.

this committee was concerned, was exposure. Exposure might lead immediately to action by their employers. It might lead, ultimately, to legislation. Naturally, there had to be some limitation on the scope of the investigation. The members selected federal installations, with which the court is not concerned, and defense plants and facilities. Their purpose was not complicated by any concepts, or underlying considerations of whether investigating defense plants was in reality, or indirectly, investigating agencies within the government. Nor was it. So far as efficiency of operation was planned to be investigated, it was that of the defense plants themselves.

It is true, as the government stated, that in another connection the Chairman testified that a point considered in studying the subject of espionage and subversion in defense plants was "how the defense security offices operated, what rules and regulations they prescribed before contracts were given to a defense establishment," and that he "always emphasize[d] the fact * * * because that was what we were primarily concerned with." However much he may have emphasized this, it could not have been emphasized in the presence of his fellow members. The testimony of none of them reflects it. Not one mentioned "defense security offices," or their operation, or "rules and regulations." In the light of this I inquired of the last witness, Senator Potter, and he stated that he had no recollection of security rules and regulations ever having been discussed.

Finally, as previously mentioned, I am not assisted by any written records which might supplement the testimony of the Senators. The Chairman testified that shortly after his appointment he discontinued the practice of his predecessors of keeping minutes of meetings. It would have seemed appropriate that at least as to matters for which the rules required express majority approval there should

have been some written record, so that precisely what was approved could be later determined. The testimony that no records of any kind were kept was somewhat contradicted, but in any event, none has been produced. The first writing to be found is the brief heading of the stenographic transcripts of the subsequent hearings, which was, "Subversion and Espionage in Defense Installations."[8]

■ To summarize, I am not able to find that a quorum of the Subcommittee ever gave approval for an investigation of the efficiency of operation of agencies within the government responsible for contracting with defense plants, or for establishing their security rules and regulations. I find that the investigation authorized, so far as it related to defense plants, was of the defense plants themselves, in respect to their own efficiency of operation in preventing the infiltration of subversives.

If material, I also find that the investigation actually pursued was the one authorized, and with no further purpose. The Chairman's affirmation that the Subcommittee was primarily concerned with how defense security offices operated, and what rules and regulations they prescribed, appears to be no more substantiated by the record of subsequent proceedings than by the testimony of the members. I believe it to be an afterthought. As a sample check I have read the transcript of every public Boston hearing, and of all Boston executive hearings from which a "confidential" restriction has been removed. Not a question seems to have been directed towards investigating the operation of agencies within the government, unless it be said that the mere presence of a Communist on the payroll of a private contractor doing government work is in itself evidence of inefficiency of the government agency employing the contractor, a very broad assumption. All other questions either negate the government's contention, or

8. When these transcripts were given to the Government Printing Office the title was expanded to "Subversion and Espionage in Defense Establishments and Industry."

are, at best, ambivalent. I also have in mind, in view of the questions asked of two Harvard employees, that no further inquiry was made of Harvard, and these two employees were asked none of the obvious questions. which might throw light on the operations of government agencies responsible for contracting with the University. It is hard to believe, if the Subcommittee had any interest in the relationship of defense agencies to an institution where they had spent some fifty million dollars, that it would have inquired of no one but one assistant professor, and one research assistant in psychology who, as an undergraduate, had a summer job reading simulated radar. As to these two the Chairman testified he came upon them "accidentally." The accident does not appear to have occurred during any general investigation of defense agencies with relation to Harvard, but was merely his discovery of the testimony before Senator Jenner, who was engaged in investigating Communism in education. The present Subcommittee's recommendation to the Senate, that all federal grants be cut off from educational institutions that retained any Communist or persons claiming the Fifth Amendment in their employ, scarcely related to the operation of defense agencies. Finally, and most important, I have examined the two annual reports of the Committee to the Senate for the years 1953 and 1954 and the special report, January, 1955, on Subversion and Espionage in Defense Establishments and Industry. These reports dwell extensively on Communist, or "Fifth-Amendment Communist," infiltration into defense plants. Largely they are devoted to the identity and location of the individuals involved. In addition, they list those who have been discharged, and refer to the steps the Subcommittee has taken in inducing certain defense plants to improve their own security. With one exception there is nothing in any report suggesting that the Subcommittee was giving atten-

tion to the operation of departments and agencies within the government responsible for contracting with, or supervising, defense industry. The single exception is a brief reference to the fact that there were no defense department security regulations preventing subversives from being employed by defense establishments on unclassified work. A footnote concedes that even this matter was discovered by the Senate Armed Services Committee. In other words, it seems to me that any contention that the investigation was in reality a study of the operation of departments and agencies within the government is entirely insubstantial.

◼ I have gone into this issue at some length because I believe it may be important to the consideration of the scope of the jurisdiction of the Committee, and hence of the Subcommittee, the ultimate question in the case. It also, of course, relates to the issue of pertinency, with which I will deal first. I rule that the question in Count 1, to give the names of any Communists known to the defendant as presently employed in defense plants (by virtue of what he had already been told at the executive hearing the defendant knew this meant "any plant doing work for the Department of Defense"), was pertinent on its face to the question under inquiry. Similarly I rule that the Count 5 question, "Did he know whether Emanuel Blum had contacts with people handling classified government material" was pertinent. True, this question was not pertinent on its face, but I find that the defendant knew Blum was a high-placed district organizer for the Communist party, who may well have had contacts with defense workers, and I rule that pertinency to the knowledge of the witness is enough.[9] True, also, Blum's "contacts" conceivably might have been innocent ones, but a question need not be the ultimate in pertinency. If it is principally pertinent it need not

9. The question is also to be read in the light of what the Chairman told the witness was the subject of the inquiry, namely, Communist infiltration into defense plants.

exclude every possible irrelevancy, at least unless there is objection by the witness. Cf. United States v. Orman, 3 Cir., 207 F.2d 148.

■ The defendant contends that it is not enough for a question to be pertinent—the witness must be informed of the subject matter, so that he may have a definite standard by which to determine whether he should answer. Because if he was not so informed he admittedly indicated no interest, and did not choose to supplement any deficiency in his knowledge by asking either the Chairman or his own counsel, I regard this contention as immaterial. However, since my obligation is to find the facts, and the government, while it has largely persuaded me, has no case law directly supporting this theory of waiver, which may be a novel one,[10] I will pursue this question. The Chairman testified that in the anteroom, before the executive hearing, defendant's counsel inquired why the defendant was being summoned when he had already been examined by the Jenner Committee, and that he told him. The defendant denied that any conversation took place. Peculiarly enough, although the Chairman's evidence was unfavorable to the defendant, it was reintroduced by the defendant with knowledge of what it was going to be, since I had previously ruled it out as unresponsive. Seemingly it was introduced for the sole purpose of contradicting it. I am not disposed to give full credence to the contradiction. Some might ask, and some might not, but certainly it would not be unnatural for

counsel to have made such an inquiry, given the opportunity, and plainly the opportunity was there. I am aided in resolving this evidentiary dispute by an interpolation made by the defendant when he read his prepared statement at the public hearing. This interpolation tends to indicate he had in fact been "officially informed" since the time of preparing it.[11] I believe that something was said to the Chairman about the Jenner hearing, and that his reply was that this was a different committee, and that the defendant "was being called in connection with Communist infiltration of defense plants." This was sufficient compliance with any duty there may have been.

■ Next, the defendant contends that because of the Chairman's admitted hostile attitude towards the president of Harvard University, defendant's employer, I should find that the hearing was a personal vendetta and not a legitimate investigation. Insofar as certain questions asked clearly exceeded in content the bounds of the investigation, I have already ruled them out. 135 F.Supp. 382. The remaining questions in the indictment were appropriate to the subject matter under inquiry. The exhibits indicate that similar questions were asked of many other witnesses. I will neither find nor rule that they became improper here because the Chairman may have had special personal motives with regard to this witness due to his employment by Harvard.[12] Nor will I rule that the hearing was invalidated by reason of the fact that some of the questions asked may

10. The boundary between what can be waived, and what cannot, has not been fully determined. Cf. United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884, rehearing denied 339 U.S. 991, 70 S.Ct. 1018, 94 L.Ed. 1391.

11. The purport of his remark is clearer on the tape recording of the hearing than in the typewritten transcript. Additional words there appearing persuade me that the phrase "This is not applicable now" referred prospectively to the statement that he had not been officially informed, and not retrospectively, as

defendant contended at the trial, to the receipt of a subpoena.

12. The defendant also contends that he should not have been subjected to this inquiry because he was not sufficiently connected with the questions asked. Cf. United States v. Orman, 3 Cir., 207 F.2d 148. I find he was sufficiently connected within any such principle. It is to be noted, incidentally, that he apparently did have pertinent information on at least one of the two questions still in the indictment, for on other occasions when he could definitely answer in the negative he did so.

have been improper for other reasons, or because one of the motives of the Subcommittee may have been the exercise of police or other powers that it did not possess.

⬛ The balance of this opinion deals with the statutory powers of the Committee, as distinguished from what authority the Committee may have given the Subcommittee, or the Subcommittee may have given the Chairman. Obviously the statutory authority is the maximum limit, because the Committee could not delegate what it did not have. In this connection I must observe, because the government makes so much of the point in its brief, that the question is not whether Congress could investigate all aspects of Communism, or whether it could delegate such study to a committee. Of this there can be no doubt. Lawson v. United States, 85 U.S.App.D. C. 167, 176 F.2d 49, certiorari denied 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1352, rehearing denied 339 U.S. 972, 70 S.Ct. 994, 94 L.Ed. 1379. The problem is simply whether Congress gave authority to this particular Committee extensive enough to cover the subject matter of this particular inquiry. The government spends much time arguing the question of Congressional power, while the real and only question is one of statutory interpretation.

There remains the essential matter of the authority of the Committee. The pertinent legislative grant is contained in § 102 of the Legislative Reorganization Act of 1946, Public Law 601, Rule XXV, 60 Stat. 816.

"(g) (2) Such committee shall have the duty of—

\* \* \* \* \*

"(B) studying the operation of Government activities at all levels with a view to determining its economy and efficiency."

The government argues that the "defense program" is a government "activity,"[13] and hence appropriate for the Committee to investigate in all its aspects under subsection (B). With all respect, I think that calling a program an "activity" is language which obscures thought. A program is not an activity, except in the loosest form of expression. In point of fact I believe that the defense program so-called, comprises not one, but many activities, and, more important, that to determine the legal consequences involved, analysis of the individual activities is essential. The defense program consists of sundry activities at the legislative level, at the top and lower executive levels, and in various agencies within the government. Beyond that it includes, of course, many phases of private industry. If the term is used loosely it has, on occasion, descended to such private activities as the formation of car pools to reduce public consumption of gasoline. It seems to me obvious that one cannot group together under a single heading such disparate matters and say that the same legal consequences must apply to all or, if jurisdiction be established over one, that it applies automatically to the rest. Indeed, elsewhere in its brief the government seems to recognize this, by stating that there may be questions of degree, and that the existence of Communists in a fine arts museum, for instance, may be different from Communists in a defense plant. Yet it is apparent that a concentration of Communists anywhere, with consequent opportunity to sabotage public utilities, or the homes of workers, or defense plants from without, might constitute a severe menace to the successful carrying out of the defense program. How far does the Committee's authority go?

⬛ The final arbiter of such questions must be the intent of Congress, as

---

13. In its brief it twice states that "subversion and espionage in defense plants \* \* \* [necessarily relates] to the ef- ficiency of a government activity, i. e., the defense program."

expressed in the statute. The statute gave the Committee the duty of "(B) studying the operation of Government activities at all levels with a view to determining its economy and efficiency." The parties have failed to analyze this language. Studying the operation of government activities at all levels must mean, since operation is to be studied, at all levels of operation, or, at all "operational levels." In other words, the Committee's jurisdiction under this subsection is limited to government activity, which activity is to be studied at all operational levels, but, since jurisdiction exists only as granted, not otherwise.

Government activity must mean "activity * * * performed by the Government." Indian Towing Co., Inc., v. United States, 350 U.S. 61, 67, 76 S.Ct. 122, 126. There, a suit under the Federal Tort Claims Act, the court further held that the maintenance of a lighthouse by the Coast Guard was "governmental activity" on an "operational level." I think it clearly implicit in the opinion that if the government had delegated the maintenance of the lighthouse to a private contractor, the acts of such contractor, if government activity at all, would be below the "operational level." It is not the purpose that determines who is performing the operation. Even though the government may be directly affected, the separation between private parties acting under government contract, and the government itself, is marked and distinct. State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3. The Court has recently pointed out that in such cases, even in the extreme instance where a plant is government owned, if "managerial responsibility [rests] upon independent contractors", that is "private, rather than public, operation of war production plants", entailing quite different legal consequences. Powell v. United States Cartridge Co., 339 U.S. 497, 506–507, 70 S.Ct. 755, 761, 94 L.Ed. 1017. The question in that case is not related to the one at bar, but the decision and the language used suggest clearly the difference between government and private "operation," regardless of the intended use of the products to be manufactured.

In Von Knorr v. Miles, D.C.D.Mass., 60 F.Supp. 962, modified on other grounds, sub nom. Von Knorr v. Griswold, 1 Cir., 156 F.2d 287, the court had before it the constitutionality and propriety of an order of the Commanding General, First Service Command, requiring Cities Service Oil Co., a defense plant in the present sense, to discharge an employee because of suspected subversive activities. Judge Wyzanski said, at 60 F.Supp. 969,

> "*Cities Service Oil Company was operating* what was in essence *a private arsenal* of our democracy. The supplies it was preparing were designed for the use of the armed forces * * *." (Italics supplied.)

It seems to me that as a pure matter of language private operation of private industry is not "activity performed by the government" on an "operational level," and that the general economy and efficiency of such private operation is beyond the scope of the Committee. I cannot believe that Congress intended otherwise.[14]

14. It may be recalled that the name of the Committee was the Committee on Government Operations. The Committee itself, when interpreting its powers, laid no express claim to jurisdiction over private industry. In its reports to the Senate it translated subsection (B) to mean the duty to investigate "the operation of all *Government departments* at all levels, with a view to determining their economy and efficiency." (Italics supplied.) It is difficult to construe this as including the power to investigate the economy and efficiency of private agencies doing government work. The jurisdiction this would entail would be enormous. If the Committee had as part of its regular duties supervision of the economy and efficiency of independent contractors it would, of course, be in no

This determination does not dispose of the case. Two possible questions remain. Even if the Committee does not have general jurisdiction over the operation of defense plants, may it not make special inquiry there in connection with a study of the operation of defense departments, to the extent that such inquiry may cast light upon a subject over which it does have jurisdiction?[15] And if it may, is it open to the court to pass on the question of whether in the particular instance the Committee was correctly considering the matter from the proper aspect, or was, instead, engaged in a pursuit beyond its powers? In this connection the government has referred to the so-called presumption of regularity, or legitimacy of purpose. This presumption is applicable to all tribunals, judicial, quasi-judicial and administrative. In Morford v. United States, 85 U.S.App.D.C. 172, 176 F.2d 54, 58, reversed on other grounds, 339 U.S. 258, 70 S.Ct. 586, 94 L.Ed. 815, in speaking of a Congressional committee, the court said that when the "subject of investigation" is a lawful one "a legitimate legislative purpose is presumed" which "cannot be rebutted by impugning the motives of individual members of the Committee." See, also, United States v. Orman, 3 Cir., 207 F.2d 148. This means that if a committee has the right to investigate Communism in defense plants, for instance, its inquiry in one particular plant cannot be attacked by a claim that that one was selected for personal, ulterior or improper motives, or was for a purpose other than what it purported to be.

The government argues that if for the purpose of studying defense departments the Committee might to some extent investigate conditions in defense plants, the court cannot go behind an inquiry into defense plants to examine the purpose—that its legitimacy of purpose must be presumed. This argument overstates the principle. The presumption of a proper legislative purpose relates to regularity of motive, namely, a presumption that the motive is a legislative one, as distinguished from being, for example, "a desire to 'expose' * * * activities regarded by the committee as detrimental or undesirable, or investigations designed and conducted for the personal political aggrandizement of committee members." Van Alstyne, Congressional Investigations, 15 F.R.D. 471, 478. For reasons of public policy it is "conclusively presumed" by the courts that such motives do not exist, even though in fact they may. Jurisdiction, however, is something else. It has never been suggested that the courts could not find that the subject matter of the inquiry was beyond the power of a committee, United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770, or of Congress itself. See McGrain v. Daugherty, 273 U.S. 135, 176, 47 S.Ct. 319, 71 L.Ed. 1580; Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241, 246,

way limited to subversion and espionage, but would cover economy and efficiency of every type. The Committee could consider whether a contractor would operate more effectively with a closed shop; if its employees would be more efficient with a bonus incentive scheme; whether wages were too high, or too low; whether it would be more economical to install new machinery; or whether the company's president spends too much time away from the plant. The government's argument, made on a number of occasions, that this Committee was charged with determining the efficiency of defense plants because it had the duty of studying every aspect of "whether the government was getting is money's worth," would lead to avenues having no end. So comprehensive a purpose in such broad fields should require far more compelling statutory language.

15. I shall assume for the purposes of this decision that the Committee has full jurisdiction over the internal economy and efficiency of operation of executive departments of the government, and that the answer to this question is in the affirmative.

certiorari denied 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767, rehearing denied 339 U.S. 971, 70 S.Ct. 1001, 94 L.Ed. 1379. No presumption creates jurisdiction.[16] That depends, particularly in the case of a subject selected not by Congress, but by a committee which, like a court, has limited jurisdiction, upon the committee's grant of authority with relation to the subject matter. If the committee selected a subject which is prima facie within its jurisdiction, doubtless a court could not go behind it, since jurisdiction then affirmatively appears. But if it selected a subject that was not prima facie within its jurisdiction, but was prima facie without it, it is not entitled to a presumption that the investigation differed from what it purported to be. That would be, in effect, to operate the presumption in reverse.

On its face the investigation here purported to be of "Subversion and Espionage in Defense Establishments and Industry," which has been shown to mean defense plants. Under such circumstances it is not open to the government to contend that the investigation might have been something else, or may be presumed to have been something else, and that if it had been, it might have been appropriate for the Subcommittee to have done what it did. This is a criminal prosecution. There is a burden on the government, which is not to be met by speculation. The government established through its own witnesses the subject of investigation, and can have no complaint if it is thereafter taken at its face value. On its face the investigation was of private and not of government operation as heretofore defined, and was outside the jurisdiction of the Committee.

It follows that the defendant must be acquitted.

---

16. It is frequently held, for instance, in spite of the "presumption * * * of regularity," that applies to courts and Congressional committees alike, see Barry v. United States ex rel. Cunningham, 279 U.S. 597, 619, 49 S.Ct. 452, 457, 73 L.Ed. 867, that "jurisdiction of a federal court is never to be presumed," Doidge v. Cunard S. S. Co., 1 Cir., 19 F. 2d 500, 502, but must affirmatively appear. Thomson v. Gaskill, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951.